SMITH, Appellee,

v.

EMERY–SMITH, Appellant.

[Cite as *Smith v. Emery–Smith*, 190 Ohio App.3d 335, 2010-Ohio-5302.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

No. 2009–G–2941.

Decided Oct. 29, 2010.

Sarah L. Heffter and Peter A. Russell, for appellee.

J. Michael Drain, for appellant.

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Appellant, Gloria Emery–Smith, appeals the judgment of divorce of the Geauga County Court of Common Pleas. Gloria challenges the trial court's finding that the marital residence of her and her former husband, appellee, William Alan Smith, is a marital asset. She also contests the court's finding that she engaged in financial misconduct with respect to William's stock certificates. For the reasons that follow, we affirm in part, reverse in part, and remand.

{¶ 2} The parties were married on December 24, 1985. They have one son, Gregory, age 17. During the marriage, William worked at a food warehouse earning an annual income of $27,750 in the last year of their marriage. Gloria

worked as a waitress earning an annual income of $25,394. William filed a complaint for divorce on March 7, 2008. The parties stipulated to most issues in the case, including the grounds for divorce, custody, visitation, and child support. They agreed that the duration of the marriage was from December 24, 1985, to March 20, 2009. They agreed that the marital portion of William's pension would be divided by a qualified domestic relations order. They agreed that each party would pay his or her separate debt and attorney fees and that court costs would be divided equally. They also agreed that neither party would receive spousal support.

{¶ 3} The only issues to which the parties did not agree were (1) whether their marital residence is marital property or Gloria's separate property and (2) whether Gloria's sale of William's stock certificates amounted to financial misconduct. The magistrate conducted a hearing on these issues, at which William, Gloria, and Gloria's mother, Irene Barry, testified.

{¶ 4} William testified that in August 1983, two years before the parties married, he moved into Gloria's house in Bedford, Ohio, which was owned by Mrs. Barry. She had purchased the house earlier in 1983 for Gloria, and Gloria agreed to make the mortgage payment. Mrs. Barry testified that although the house was titled in her name, she thought of it as Gloria's property. After the parties were married in 1985, they continued to live in the house for 13 years.

{¶ 5} William testified that he and Gloria paid all bills on the house, including the mortgage payment, all utilities, the real estate taxes, and property insurance. They made these payments from a joint checking account funded by both of their earnings.

{¶ 6} Mrs. Barry lived with her husband in Solon until he died in 1996. Following his death, she moved in with the parties at their Bedford residence.

{¶ 7} In June 1998, Mrs. Barry sold her house in Solon and William and Gloria's house in Bedford, and purchased another house at 16451 Stoneridge Road, Bainbridge, Ohio for the parties to use as their marital residence. Mrs. Barry testified that when she purchased the Bainbridge property, she had the house titled in Gloria's name alone because she wanted the family's money to remain in her family.

{¶ 8} Mrs. Barry moved in with William and Gloria, and stayed with them until 2002. During that time there was no mortgage on the home. One year after she left, the parties got behind on their bills. Gloria testified that in order to pay off their debt, she suggested they get a mortgage loan on the property. As a result, in 2003 the parties took out a mortgage loan for approximately $51,000. Shortly thereafter, the parties again got behind on their debt and refinanced their mortgage, borrowing an additional $40,000 on the property. They borrowed a

total of approximately $91,000. Gloria signed the mortgage, which secured the entire loan, and both she and William signed the mortgage notes. Both parties testified the loan was used to pay their joint credit card debt, to construct an outbuilding and make other improvements to the property, and to purchase a car for Gloria. However, no specifics were provided concerning the loan or the amounts owed for any of these items.

{¶ 9} Gloria testified that at closing, she was required by the bank to sign a series of documents in order to receive the loan proceeds. These included a joint and survivorship quitclaim deed on the Bainbridge property in favor of her and William. She said she signed the deed because the bank required it as part of the loan process, not because she intended to give William an interest in the property. She said that she never discussed with William putting his name on the deed, and that he did not know she had signed it until years later.

{¶ 10} The parties' joint incomes were used to pay the mortgage loan and all property expenses on the Bainbridge property.

{¶ 11} William testified that in August 2007, he left the marital residence and voluntarily admitted himself to Laurelwood Hospital for drug and alcohol treatment.

{¶ 12} He testified that in 2000, he had inherited Sherwin Williams and Honeywell International stock certificates from his parents. They were titled solely in his name.

{¶ 13} He said that on August 23, 2007, without his knowledge or approval and while he was still an inpatient at Laurelwood, Gloria deposited into the parties' joint Merrill Lynch account 106 shares of his Honeywell stock and 375 shares of his Sherwin Williams stock, the combined value of which was $10,250. One week later, on August 31, 2007, without William's knowledge or approval and while he was still an inpatient at Laurelwood, Gloria withdrew the entire value of the stocks and spent the proceeds. Merrill Lynch issued a check to William and Gloria for this amount, and Gloria endorsed it by signing her and William's names on the check. William presented the Merrill Lynch statement and the disbursement check to support his testimony.

{¶ 14} In contrast to William's testimony, Gloria testified that William called her and suggested that they use his stocks to pay the parties' bills. She testified that they agreed that she could take $10,000 for the stocks. She concedes that she endorsed the Merrill Lynch check by signing William's name to the back of the check, and then put it in her own checking account. She said she used the check to pay their household expenses. However, as the magistrate found, "[t]here was no documentation verifying that the $10,250 was used to pay down marital debt or that it was used for living expenses." Gloria conceded on cross-

examination that during the time William was in Laurelwood, she used his monthly pension check and an additional monthly payment of $275 he sent her for household expenses.

{¶ 15} In finding the Bainbridge property to be a marital asset, the magistrate in her decision found: "[Gloria's] decision to execute the deed titling the property in both her and [William's] names in order to accomplish a refinance so joint marital debt could be paid, and so she could purchase a car is evidence of more than mere holding of title. There was competent and credible evidence of [Gloria's] donative intent."

{¶ 16} The magistrate also found that Gloria's "actions of depositing [William's] stocks into a joint [Merrill Lynch] account, her withdrawal of the $10,250, her forgery of [William's] name on the check and then cashing it, all without [William's] knowledge or approval, constitutes financial misconduct."

{¶ 17} Gloria filed objections to the magistrate's decision. The trial court overruled the objections and adopted the magistrate's decision.

{¶ 18} In the divorce decree, the court ordered that upon Gregory's emancipation, the Bainbridge property would be sold and that until it was sold, the parties would equally share the mortgage payments, real estate taxes, and property insurance. In light of Gloria's financial misconduct, the court also ordered that William would receive the first $10,250 from the proceeds of the sale of the marital residence and that the balance, if any, would be shared equally by the parties.

{¶ 19} Gloria appeals the trial court's judgment, asserting three assignments of error. Because her first two assigned errors are interrelated, they will be considered together. For her first and second assignments of error, she contends:

{¶ 20} "[1.] The trial court erred to the prejudice of defendant-appellant in finding that the marital residence of the parties was a marital asset.

{¶ 21} "[2.] The trial court's judgment respecting division of the marital residence as a marital asset was against the manifest weight of the evidence."

{¶ 22} Gloria argues that the Bainbridge property is her separate property and that the trial court erred in designating it as marital property. A trial court's determination of property as either marital or separate is reviewed under the manifest-weight-of-the-evidence standard of review. *Gosser v. Gosser*, 11th Dist. No. 2006–T–0029, 2007-Ohio-3201, 2007 WL 1810521, at ¶ 6. Under this standard, the judgment of the trial court will not be reversed if the court's decision is supported by some competent, credible evidence. *Id.*

{¶ 23} "Marital property" is defined at R.C. 3105.171(A)(3)(a)(i) as "[a]ll real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage." "'Marital property' does not include any separate property." R.C. 3105.171(A)(3)(b). R.C. 3105.171(A)(6)(a)(vii) defines "separate property" to include "[a]ny gift of any real * * * property * * * that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." According to R.C. 3105.171(B), the trial court is required to identify marital property and separate property and to divide both equitably between the spouses.

{¶ 24} Gloria argues that the proceeds used to purchase the Bainbridge property can be traced to the proceeds from the sale of Mrs. Barry's properties in Solon and Bedford. As a result, Gloria argues that the Bainbridge property is her separate property. However, tracing was not the issue below. In the trial court, it was undisputed that the Bainbridge property was purchased by Mrs. Barry from the proceeds of the sale of her two properties and that she intended the Bainbridge property to be Gloria's separate property. In fact, the magistrate found: "Mrs. [Barry's] testimony and the documentation presented at trial clearly evidence that when Mrs. [Barry] had the [Bainbridge] residence titled in her daughter's name, it was a gift to her alone. Had the property remained in [Gloria's] name, there would be no issue, the property would have remained [Gloria's] separate asset. * * * The issue is whether, the act of [Gloria] executing a joint and survivorship deed to [William] in 2003, destroyed the separate nature of the property." Thus, the issue below was not whether Mrs. Barry's funds could be traced to the Bainbridge property. Instead, the issue was whether Gloria intended to give to William an interest in the Bainbridge property in 2003 when she executed a joint and survivorship deed granting that interest to him.

{¶ 25} In *Osborn v. Osborn,* 11th Dist. No. 2003–T–0111, 2004-Ohio-6476, 2004 WL 2785554, this court held that separate property can be converted to marital property if it is given from one spouse to another. Id. at ¶ 31. This court stated:

{¶ 26} "Under R.C. 3105.171(H), 'the holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital property or separate property.' Thus, we must examine the surrounding circumstances to determine whether appellant's execution of a joint survivorship deed transformed the real estate into marital property.

{¶ 27} "'Spouses can change separate property to marital property based on actions during the marriage.' *Moore v. Moore* (1992), 83 Ohio App.3d 75, 77, 613 N.E.2d 1097. The primary method for effecting this change is through an inter

vivos gift of the property from the donor spouse to the donee spouse. *Helton v. Helton* (1996), 114 Ohio App.3d 683, 685, 683 N.E.2d 1157. '[A]n inter vivos gift is an immediate, voluntary, gratuitous and irrevocable transfer of property by a competent donor to another.' *Smith v. Shafer* (1993), 89 Ohio App.3d 181, 183, 623 N.E.2d 1261. The essential elements of an inter vivos gift are:

{¶ 28} " '(1) [the] intent of the donor to make an immediate gift; (2) delivery of the property to the donee; [and] (3) acceptance of the gift by the donee.' *Barkley v. Barkley* (1997), 119 Ohio App.3d 155, at fn. 2, 694 N.E.2d 989.

{¶ 29} "Generally, the donee has the burden of showing, by clear and convincing evidence, that the donor made an inter vivos gift. *Smith* at 183, 623 N.E.2d 1261." Id. at ¶ 30–33.

{¶ 30} The only element of an inter vivos gift challenged by Gloria is whether she intended to make an immediate gift of an interest in the property to William when she executed the deed. Since William was the purported donee, he had the burden to prove that Gloria intended to make an immediate gift.

{¶ 31} However, William did not testify that in executing the deed, Gloria intended to transfer an interest in the property to him. He testified that when Mrs. Barry purchased the Bainbridge property in 1998, he had no idea whether his name was going to be on the title. He did not testify that he was aware of the quitclaim deed when Gloria signed it in 2003, but he said that he "understood" at that time that they both owned the property. He said that by Gloria signing the deed, it was his understanding that "we [sic] had corrected the mistake that was made that I wasn't on the deed in the first place." However, he did not testify that Gloria ever said she intended to give him an interest in the property.

{¶ 32} In fact, Gloria testified that she signed the deed conveying an interest in the property to William only because the bank required her to do so as part of the loan process. The magistrate dismissed this testimony because Gloria did not present other evidence to corroborate it. However, William did not contradict it, and Gloria's testimony in this regard is therefore undisputed.

{¶ 33} Gloria also testified that when she signed the deed, she did not tell William she had signed it and he did not learn about it until years later. This is consistent with William's testimony and corroborates that when she signed the deed, Gloria did not intend to give him an interest in the property.

{¶ 34} Moreover, Gloria's testimony that she signed the deed only because the bank required it is corroborated by the circumstances surrounding its execution. The quitclaim deed was presented to her at the closing with the other documents the bank required her to sign. The date of the deed also supports Gloria's testimony. While the parties did not present any evidence concerning the date of

the closing, it is undisputed that it occurred in 2003, and the deed was dated February 25, 2003.

{¶ 35} The only evidence referred to by the trial court in support of its finding that Gloria intended to transfer an interest in the property to William was the fact that Gloria used her property as security for a loan. The trial court found:

{¶ 36} "[Gloria's] execution of a * * * deed transferring the real property from herself to herself and [William] was not, in and of itself, sufficient evidence to prove that she was making a gift. However, the totality of the circumstances and [Gloria's] conduct clearly establish that she intended that [William] be a co-owner of the property. Using the real property as security for a mortgage loan that benefitted both parties is demonstrative of [Gloria's] recognition that the real property belonged to both of the parties."

{¶ 37} However, it is well settled that "the refinancing of a home after a marriage does not in any way convert separate property into marital property where the mortgage was not taken in order 'to finance the purchase of the residence.'" *Ockunzzi v. Ockunzzi*, 8th Dist. No. 86785, 2006-Ohio-5741, 2006 WL 3095754, at ¶ 20, quoting *Kohus v. Kohus*, 12th Dist. No. CA2002-07-055, 2003-Ohio-2551, 2003 WL 21135479, at ¶ 21. In considering circumstances similar to those presented in the instant case, the Eighth District in *Ockunzzi* stated:

{¶ 38} "In this case, the refinancing and home equity lines were used to pay off existing mortgages, car loans and other debts, * * * and to build an addition onto the home. Simply because Jay's [separate] interest in the home was used as collateral to secure a home equity loan, which was used to purchase goods or services that became marital assets, did not convert Jay's separate interest to marital property." Id. at ¶ 21.

{¶ 39} Although the Bainbridge property was used as security for a loan, the mortgage was *not* given in order to finance the purchase of the home. Thus, contrary to the trial court's finding, the fact that Gloria used the property as security for a mortgage loan does not evidence donative intent. *Ockunzzi*, supra.

{¶ 40} Based on our review of the record, William did not meet his burden of proof, and there is no competent, credible evidence that Gloria intended to give an interest in her property to William. We therefore hold that the trial court erred in making this finding. Since we hold that the Bainbridge property is Gloria's separate property, the trial court also erred in ordering that it be sold. On remand, we find the following comment of the Eighth District in *Ockunzzi* to be pertinent: "The general rule with regard to separate property is that the trial court must disburse a spouse's separate property to that spouse. R.C. 3105.171(D). Nevertheless, the trial court has broad discretion in dividing property in a divorce. *Berish v. Berish* (1982), 69 Ohio St.2d 318, 319[, 23 O.O.3d

296], 432 N.E.2d 183. Accordingly, on remand, the trial court retains the discretion to balance any inequitable property division in accordance with R.C. 3105.171." *Ockunzzi,* 2006-Ohio-5741, 2006 WL 3095754, at ¶ 23.

{¶ 41} Next, the parties testified that one of the purposes of the mortgage loan was to construct an outbuilding on the property that cost more than $25,000 and to make other improvements. An issue was therefore presented concerning whether that contribution to the property resulted in appreciation, which would be subject to property division. However, the trial court did not consider whether William was entitled to a share of any appreciation to Gloria's property caused by his or Gloria's contribution to it during the marriage.

{¶ 42} R.C. 3105.171(A)(3)(a)(iii) provides that "marital property" includes "all * * * appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." Thus, when either spouse makes a labor, monetary, or an in-kind contribution during the marriage that causes an increase in the value of separate property, that appreciation is deemed marital property. *Gosser,* 2007-Ohio-3201, 2007 WL 1810521, at ¶ 45, citing *Middendorf v. Middendorf* (1998), 82 Ohio St.3d 397, 401, 696 N.E.2d 575. As a result of our holding that the Bainbridge property is Gloria's separate property, William would thus be entitled to share in any appreciation caused by the construction of the outbuilding and other improvements to the property financed by the loan.

{¶ 43} The trial court erred in not taking any such appreciation into account when making its division of property. R.C. 3105.171(B). We therefore also remand for the trial court to consider whether any contribution by either spouse during the marriage resulted in appreciation to the property.

{¶ 44} Further, while the magistrate found that William "remains equally responsible on the mortgage(s)," she found, "There is no marital debt." Moreover, the trial court did not address marital debt in the divorce decree. Since both parties testified that they obtained the loan, at least in part, to pay their credit card debt and to purchase a car for Gloria, it was clear their marital debt remained in place, albeit in a restructured form, and, in fact, increased.

{¶ 45} "A trial court must take into account marital debt when dividing marital property. * * * Assets and debts incurred during the marriage are presumed to be marital unless it can be proved they are separate. * * * 'The party seeking to establish that property (or debt) is separate rather than marital bears the burden of proving this to the trial court.' * * * Marital debt includes *a loan taken for any expenditure married couples make, such as buying a car or groceries or paying for cable television. * * * The determinative factor is whether the loan was incurred during the marriage.*" (Citations omitted and

emphasis added.) *Nemeth v. Nemeth*, 11th Dist. No. 2007–G–2791, 2008-Ohio-3263, 2008 WL 2582517, at ¶ 50.

{¶ 46} In the instant case, the trial court erred by not taking into consideration the parties' marital debt when dividing their property. We therefore remand the matter to the trial court for it to take into account their marital debt when dividing the property.

{¶ 47} Gloria's first and second assignments of error are sustained.

{¶ 48} For her third assignment of error, Gloria alleges:

{¶ 49} "The trial court erred to the prejudice of defendant-appellant in finding that defendant-appellant committed financial misconduct."

{¶ 50} In determining whether an equal division of the marital assets would be inequitable, a court may consider whether one party has engaged in financial misconduct. To that end, R.C. 3105.171(E)(3) provides that if a spouse has engaged in financial misconduct, including but not limited to the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property. The burden of proving financial misconduct is on the complaining party. *Gallo v. Gallo*, 11th Dist. No. 2000–L–208, 2002-Ohio-2815, 2002 WL 1173492, at ¶ 43. This court reviews a finding of financial misconduct under the manifest-weight-of-the-evidence standard. *Kita v. Kita* (Nov. 24, 1999), 9th Dist. No. 19256, 1999 WL 1068450, at *3.

{¶ 51} While William admitted at the hearing that he signed the necessary documents to open a joint account at Merrill Lynch, he testified that Gloria sold his stocks, which he had received as an inheritance from his parents, and then dissipated the proceeds without his knowledge or approval. Gloria's testimony contradicted William's in that she said that William authorized her sale of his stocks. Contrary to Gloria's suggestion, there is no evidence that William signed any documents authorizing her to sell his stocks. Although Gloria testified on direct that William had contacted her and suggested that she sell his stocks, on cross, Gloria admitted that when she sold them, William was still an inpatient at Laurelwood Hospital and that she had a civil protection order in place preventing him from contacting her. Further, William testified that while he was in Laurelwood, Gloria never called him or came to see him and that they never discussed Gloria selling his stocks.

{¶ 52} In *Sherman v. Sherman* (Oct. 5, 1989), 8th Dist. No. 55711, 1989 WL 117421, the husband had received a check for insurance proceeds belonging to him and his wife. The husband forged her name on the check and cashed it without his wife's knowledge. The husband failed to produce evidence that the proceeds were used for any marital purpose. The appellate court held: "Having

failed to produce evidence to rebut the conclusion that he converted the funds, the court did not err in allocating half of that check to the wife." Id. at *4.

{¶ 53} In the instant case, the magistrate, as the trier of fact, was entitled to believe William's testimony that he did not authorize Gloria to sell and dissipate his stocks and to discredit Gloria's version of events, as the magistrate obviously did. In adopting the magistrate's decision, the trial court found:

{¶ 54} "[Gloria's] self help actions * * * were unilateral and beyond any real or apparent authority. The stocks were unquestionably [William's] separate property. * * * [Gloria] did not seek [William's] consent, nor did she advise him of what she was doing. If the parties were not yet estranged, they were in the process of becoming so. [Gloria's] conduct was a pure and simple effort to access [William's] funds before he could. Until [William] transferred the stocks, they never lost their separate identity; consequently, [Gloria] must make [William] whole."

{¶ 55} Because the court's finding is supported by competent, credible evidence, we cannot say the court erred in finding that Gloria committed financial misconduct.

{¶ 56} Gloria's third assignment of error is overruled.

{¶ 57} For the reasons stated in the opinion of this court, it is the judgment and order of this court that the judgment of the Geauga County Court of Common Pleas is affirmed in part and reversed in part, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Judgment affirmed in part<br>and reversed in part,<br>and cause remanded.

O'TOOLE and CANNON, JJ., concur.