**In re Karen Elaine NEAL, Debtor.**

**Andrew W. Suhar, Trustee, Plaintiff,**

v.

**Craig Bruno, Defendant.**

**Bankruptcy No. 09–40749.
Adversary No. 10–4132.**

United States Bankruptcy Court,
N.D. Ohio.

Dec. 9, 2011.

Frederic P. Schwieg, Attorney at Law, Rocky River, OH, for Plaintiff.

Bruce Martin Broyles, The Law Office of Bruce M. Broyles, Boardman, OH, Samuel G. Amendolara, Youngstown, OH, for Defendant.

## MEMORANDUM OPINION

KAY WOODS, Bankruptcy Judge.

Debtor Karen Elaine Neal[1] ("Debtor" or "Ms. Ross") filed a voluntary petition pursuant to chapter 7 of the Bankruptcy Code on March 11, 2009 (Doc. # 1, Main Case), and received a discharge on July 7, 2009 (Doc. # 24, Main Case). On June 18, 2010, Plaintiff Andrew W. Suhar, Trustee ("Plaintiff" or "Mr. Suhar"), filed Adversary Proceeding to Determine the Validity, Priority or Extent of a Lien or Other Interest in Property; to Avoid a Preferential Transfer, [sic] to Recover Money or Property; to Obtain a Declaratory Judgment Relating to the Foregoing and Other Relief ("Complaint") (Doc. # 1). On July 20, 2010, Defendant Craig Bruno ("Defendant" or "Mr. Bruno") filed Answer to Complaint Filed by Craig Bruno ("Answer") (Doc. # 7). Trial was held on October 31, 2011.

At Trial, Frederic P. Schwieg, Esq., appeared on behalf of the Plaintiff. Bruce Martin Broyles, Esq., and Samuel G. Amendolara, Esq., appeared on behalf of the Defendant. The Court received testimony

---

1. The Debtor is now known as Karen Ross.

of the Plaintiff, Defendant, Debtor, Shirley Neal, and Christopher P. Lacich, Esq. In addition, the Court admitted the following exhibits: Plaintiff's Exhibits A, D, E, F, G, H, I, J and K; and accepted the parties' Joint Statement of Contested and Uncontested Facts ("Joint Statement of Facts"), filed on the docket as Doc. # 47. Upon completion of the Trial, the Court took the matter under advisement.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the general order of reference (General Order No. 84) entered in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. FACTS

### A. Stipulated Facts

The parties filed the Joint Statement of Facts on November 2, 2011, which included the following relevant facts (numbers below reflect the numbered paragraphs in the Joint Statement of Facts):

(6) The Debtor and Mr. Bruno were married for approximately thirteen years but became estranged.

(7) On or about September 4, 2008, the Trumbull County Court of Common Pleas, Domestic Relations Division issued the Decree of Dissolution attached as Joint Exhibit A ("Decree")[2].

(8) The Decree incorporated a Separation Agreement that transferred or required the transfer of all of the Debtor's interest in certain property that had been acquired during their marriage to Mr. Bruno.

(9) On June 11, 2008 the Debtor transferred her one-half interest in real property located at 109 N Raccoon Rd, Austintown, OH, 44515, [sic] ("Marital Residence"). A copy of the quit claim deed is attached as Joint Exhibit B.

(10) Prior to the transfer of the Marital Residence to Mr. Bruno the Debtor paid off a home equity loan on it thus transferring the Marital Residence to Mr. Bruno free of a substantial lien.

(11) At the time of the transfer to Mr. Bruno, the Marital Residence had a fair market value of $77,500, and was subject to a first mortgage having a balance of $50,000.

(12) In addition the Debtor waived any interest in real property located in Liberty Township, Trumbull County, Ohio, consisting of 25 acres on Tibbits Wick Road, and 34.75 acres on Oriel Rogen Road ("Real Estate").

(13) The Real Estate had been bequeathed to Mr. Bruno in 2003, and had no mortgages against it at the time of the parties [sic] divorce.

(14) Mr. Bruno also received or retained a 2003 Chevrolet Avalanche, a 2006 Suzuki Motorcycle, a 1974 Harley Davidson Sportster, a 1994 Kawasaki Motorcycle, and other vehicles titled in his name. Mr. Bruno also retained a 1971 Triumph Motorcycle, a 1979 Lincoln Town Car, and a 1979 Harley–Davidson Superglide FXE (collectively with the Marital Residence and the Real Estate the "Property").

. . .

---

**2.** On November 3, 2011, the parties filed an Amended Joint Exhibit A (Doc. # 48) to provide the Court with a complete copy of the Separation Agreement. All references to the Separation Agreement refer to the Document filed on November 3, 2011.

(16) The Debtor filed the bankruptcy case in which this adversary proceeding is commenced on March 13, [sic] 2009.

. . .

(18) The Debtor's Schedules reveal that she had a car loan of $11,000, credit card debt of $60,743.48 [sic] and a debt of $28,000 to her parents for funds used to pay off the outstanding home equity line against the Marital Residence (collectively "Debts").

(19) The Debts were incurred during the parties' marriage.

(20) Mr. Bruno had only the $50,000 mortgage against the Marital Residence as a result of the parties [sic] divorce.

(Jt. Stmt. of Facts, ¶¶ 6–14, 16 and 18–20).

### B. Additional Facts Established at Trial

At Trial, Ms. Ross testified that although she took care of the household finances, the Defendant had his own credit cards for approximately four of their joint credit card accounts. She further testified that the monthly account statements for each of these credit cards were mailed to the Marital Residence until approximately one year prior to the dissolution of the parties' marriage, at which time Ms. Ross had the statements forwarded to her parents' address. Ms. Ross testified that she used the credit cards primarily to pay for day-to-day expenses for herself and the Defendant including purchasing groceries, personal items, paper goods, clothing, cleaning supplies, as well as tickets for an occasional concert. In addition, the Debtor testified that she utilized the home equity line of credit to pay for day-to-day living expenses, just as she used the credit cards. She further testified that she, individually, borrowed $28,000.00 from her parents in order to pay off the home equity line of credit.

Ms. Ross also stated that, at the Defendant's request, she had the Defendant's name removed from two credit card accounts several months prior to September 4, 2008 ("Date of Dissolution"). Ms. Ross stated she requested removal of the Defendant's name from these accounts in an attempt to "help him out" because she knew he was trying to refinance the Marital Residence. Moreover, Ms. Ross testified that the credit card debt, home equity line of credit and her UPS pension were all discussed with Mr. Bruno during the dissolution process and when the Separation Agreement was negotiated. Ms. Ross stated that she accepted financial responsibility for the credit card debt because she wanted to avoid a long, contested divorce. The Debtor testified she had met another man and she wanted to get out of the marriage in order to move on with her life.

Mr. Suhar testified that, as of the Date of Dissolution, the present value of the Debtor's UPS pension plan was $18,434.04, using the American Experience Table of Mortality for Ms. Ross's life expectancy and the treasury bill rate as the discount rate. Because the full amount of the pension was earned during the marriage, Mr. Suhar testified that, in a contested divorce, the Defendant would likely have been entitled to one-half of the present value of the Debtor's UPS pension account. Mr. Suhar noted that, as of the Date of Dissolution, Ms. Ross was insolvent because her liabilities far exceeded her assets.

Ms. Ross's mother, Shirley Neal, testified that she lent $28,000.00 to her daughter so that Ms. Ross could pay off the home equity line of credit, which was secured by the Marital Residence. Ms. Neal explained that she made the loan because her daughter said the Defendant refused to assume responsibility for the home equity debt in the dissolution.

The Defendant testified that, although he was not represented by counsel in the dissolution proceeding, he met with his ex-wife and her counsel on several occasions. The Defendant stated the Debtor did not inform him of the amount of credit card debt which had accumulated over the course of their marriage. He further stated it was his understanding that, as of the Date of Dissolution, there was one credit card on which he was an authorized user, but he was unaware of the number of credit accounts the Debtor utilized.

Mr. Bruno also testified that, during the marriage, (i) the Debtor was solely in charge of the couple's finances; (ii) he had no idea how much the couple spent each month on household expenses; and (iii) the mortgage payment for the Marital Residence was directly debited from the Debtor's checking account.

## C. Terms of the Separation Agreement and the Decree

On September 4, 2008, the Debtor and the Defendant were granted a dissolution of their 13–year marriage. The Decree incorporated the parties' Separation Agreement, signed by the Debtor and the Defendant on July 30, 2008. The Separation Agreement provided for the division of all marital assets and debts of the Debtor and the Defendant. The pertinent terms of the Separation Agreement are summarized as follows:

Article 2. The Debtor and the Defendant each waived spousal support from the other.

Article 3. The Debtor paid off a home equity loan on the Marital Residence in the approximate amount of $28,000.00 (Jt. Stmt. of Facts ¶¶ 10 and 18) and waived all equity in the Marital Residence. In addition, the Debtor acknowledged that the Defendant had a "pre-marital" interest in other real estate, consisting of almost 60 acres of vacant land (defined as the Real Estate, *supra*, at 3–4), to which the Debtor waived all rights.

Article 4. The parties equally divided the joint tax refund and agreed to equally split the stimulus payment when it was received.

Article 5. The Debtor and the Defendant divided up their vehicles with the Debtor receiving a 1999 Pontiac Bonneville and the Defendant receiving (i) 2003 Chevrolet Avalanche; (ii) 2006 Suzuki motorcycle; (iii) 1974 Harley Davidson Sportster; (iv) 1994 Kawasaki motorcycle; and (v) other vehicles titled in his name, in addition to three other vehicles listed as non-marital property [3].

Article 6. Although no debt was identified by creditor or amount in the Separation Agreement, Article 6 stated, "Except as provided herein, there is no joint marital debt. Any individual debts of the parties shall be paid by the party who incurred the same, holding the other party harmless therefrom. Neither party thereto shall at any time incur any debt in the name of the other."

Article 7. Although not identified by financial institution or amount, the parties stated that all bank accounts had been divided to their mutual satisfaction and that the Debtor and the Defendant would each retain any and all investment accounts, IRA's, 401K's and/or pension or retirement benefits each had [4].

---

3. No value was attributed to any vehicle in the Separation Agreement.

4. The only pension plan or retirement account identified at Trial was the Debtor's UPS pension account.

Article 9. Although no personal property was itemized, identified or valued, the parties acknowledged that all personal property had been divided to their mutual satisfaction.

The terms of the Separation Agreement left the Debtor with the following marital assets: (i) a single nine-year old vehicle; (ii) unspecified personal property; (iii) unspecified bank accounts; and (iv) her retirement account from her former employer, UPS, the present value of which as of the Date of Dissolution was calculated by the Plaintiff to be $18,434.04. In addition, the Debtor paid off the secured home equity line of credit in the amount of $28,000.00 and had liability for all credit card debt incurred during the marriage, which the parties stipulated to be $60,743.48. The Defendant, on the other hand, received the following marital assets [5]: (i) the Marital Residence, which had equity in the stipulated amount of $27,500.00 ($77,000.00 - $50,000.00); (ii) at least four vehicles; (iii) unspecified personal property; and (iv) unspecified bank accounts. The Defendant's only debt was the mortgage on the Marital Residence in the amount of $50,000.00.

## II. ARGUMENTS OF THE PARTIES

Mr. Suhar asserts that the Debtor received less than reasonably equivalent value for the assets she transferred to the Defendant pursuant to the Separation Agreement. As a consequence, he seeks to recover the value of the alleged fraudulent transfer [6] for the benefit of the bankruptcy estate. The Defendant counters that the Debtor received what she would have received if the parties had gone through a contested divorce rather than a dissolution. The Defendant argues that, in a contested divorce, (i) he would have asked for (a) spousal support, (b) continued health insurance, and (c) one-half of the Debtor's pension; and (ii) he would have rebutted any presumption that the credit card debt was "marital debt" on the basis that the Debtor hid debt from him and, thus, was guilty of financial misconduct. In addition, the Defendant asserts that, by agreeing to forego a contested divorce, he saved the Debtor attorney's fees [7]. For the reasons set forth below, this Court agrees with the Plaintiff that the Debtor did not receive reasonably equivalent value for the transfers of assets she made to the Defendant pursuant to the Separation Agreement and Decree.

## III. ANALYSIS

### A. Elements of Fraudulent Conveyance

The Plaintiff seeks to avoid the transfer of certain of the marital property received by the Defendant as a result of the Decree and the Separation Agreement. The Plaintiff's Complaint contains two counts: Count I alleges that the transfers constituted implied fraudulent transfers under 11 U.S.C. § 548(a)(1)(B); and Count II alleges that the transfers constituted implied fraudulent transfers under O.R.C. §§ 1336.04 and 1336.05 and are thus recov-

---

5. The Defendant also retained the Real Estate and several vehicles that were designated as his individual property.

6. The Complaint does not contain a demand for a specific dollar amount. Plaintiff's counsel argued for recovery of $34,914.72 in his closing argument, but the Court finds that this number is based on faulty math and/or analysis.

7. The Court notes that a contested divorce would have resulted in the Defendant also incurring attorney's fees, making this argument, in essence, a "wash" for purposes of determining an equitable division of marital assets and debts.

erable by the Plaintiff pursuant to 11 U.S.C. §§ 544 and 550.

Section 548 provides:

(a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property, ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

\* \* \*

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548 (West 2010).

■ To prevail on a claim under § 548(a)(1)(B), the Plaintiff must show: (i) the Debtor transferred an interest in property; (ii) the transfer occurred within two years before the date the bankruptcy petition was filed; (iii) the Debtor received less than reasonably equivalent value in exchange for the transfer; and (iv) the Debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer [8].

Ohio law provides similar guidance regarding the determination of whether a conveyance was fraudulent in Sections 1336.04 and 1336.05 of the Ohio Revised Code. Section 1336.05 provides, in pertinent part [9]:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

O.R.C. § 1336.05(A) (Page's 2010).

Here, there is no dispute that the Plaintiff has established three of the four elements of both 11 U.S.C. § 548(a)(1)(B) and O.R.C. § 1336.05(A). The first two elements—*i.e.,* that the Debtor transferred an interest in property within two years of the bankruptcy petition date are established by the Joint Statement of Facts, which shows that the Debtor transferred property to the Defendant on the Date of Dissolution—September 8, 2008—and subsequently filed her bankruptcy petition on March 11, 2009, which was approximately six months later. The evidence supports the fourth element that the Debtor was insolvent as of the date of transfer or became insolvent as a result of the transfer. As a result of the division of marital property in the Separation Agreement and the Decree, the Debtor's debts of approximately $100,000.00 ($11,000.00 car debt plus $28,000.00 debt to her parents plus more than $60,000.00 in credit card debt) far exceeded her interest in the UPS pension account and the 1999 Pontiac. Moreover, the Debtor filed her bankruptcy petition in close temporal proximity to the

---

8. 11 U.S.C. § 548(a)(1)(B)(ii) lists four subparts—(I) through (IV)—that are in the disjunctive. Only one of the subparts needs to be established. In this case, the Plaintiff has established that the Debtor was insolvent on the date that she transferred assets to the Defendant pursuant to the terms of the Separation Agreement and the Decree.

9. The Court does not address O.R.C. § 1336.04 because there was no evidence of any of the following: (i) the Debtor was engaged in business; (ii) the Debtor intended to incur or believed she would incur debts beyond her ability to pay as they became due; or (iii) actual fraud—all of which are elements of Section 1336.04.

Date of Dissolution, indicating that she was either (i) insolvent on the date of the transfer; or (ii) insolvent as a result of the transfer. Thus, the Court must only determine whether the Debtor received less than reasonably equivalent value in exchange for the transfer.

## B. Equitable Division of Marital Property Required by Ohio Law

 In Ohio, there is a presumption that all assets acquired during a marriage are marital assets to be equally divided. In addition, all debt is presumed to be marital debt if acquired during the marriage.

Trial courts must divide marital property equitably between the spouses. In most cases, this requires that marital property be divided equally. However, if the trial court determines that an equal division would produce an inequitable result, it must divide the property in a way it deems equitable. Furthermore, [a] trial court must take into account marital debt when dividing marital property.... Therefore, under R.C. 3105.171(C)(1), marital debt should also be divided equally unless such a division would be inequitable.

*Machesky v. Machesky,* 2011 WL 686180 at *2–3, 2011 Ohio App. LEXIS 753 at *5–6 (Ohio Ct.App., Feb. 23, 2011) (internal citations and quotation marks omitted).

 It is clear from the face of the Separation Agreement that the Debtor and the Defendant did not equally divide their assets. Not only were the assets not equally divided, they were not equitably divided. Both the Debtor and the Defendant were healthy, able-bodied adults, capable of earning a living and supporting themselves. There was no evidence of any special circumstances that would mandate anything other than an equal division of property by and between the Debtor and the Defendant. From an objective perspective, it is inexplicable why the Debtor would pay off the home equity loan (thus increasing the equity in the Marital Residence by $28,000.00) and then waive all rights to any equity in the Marital Residence. Although the Debtor claims she agreed to whatever the Defendant asked for to avoid a protracted, contested divorce, any benefit the Debtor may have received in foregoing a protracted, contested divorce does not and cannot constitute reasonably equivalent value.

## C. Defendant Argued that Division of Property was Equitable

The Defendant made three arguments that the Separation Agreement provided the Debtor with what she would have received in a contested divorce. First, he argued that, absent the agreements in the Separation Agreement, he would have asked for spousal support and continued health insurance from the Debtor. However, there was no evidence or other indication that the Defendant would have been awarded spousal support. The Debtor and the Defendant were each capable of supporting themselves. The Defendant argued that the Debtor was voluntarily underemployed because she voluntarily terminated her employment at UPS and was subsequently earning less money. From the Court's perspective, however, it is the Defendant who appears to have been voluntarily underemployed. Although the Defendant is a licensed cosmetologist who rents a chair in a salon, his net earnings for the three years prior to the divorce never exceeded $2,000.00 per year. (*See* Pl. Ex. E, F and G.) The Defendant gave no reason why he earned so little nor did he argue that he was incapable of earning more money. He merely asserted that he was "used" to having the Debtor be the breadwinner during the marriage, and that

both of them were "OK" with that arrangement. The Debtor, on the other hand, testified that the more money she made, the less the Defendant worked. Under the circumstances, it appears unlikely that a trial court would have awarded the Defendant spousal support. Indeed, the record is devoid of any evidence or argument about how much spousal support might have been awarded or for how long. The Defendant also argued that he would have asked for continued health insurance, but there is nothing whatsoever in the record concerning health insurance. The Separation Agreement also failed to address this issue. As a consequence, there is nothing in the record concerning the likelihood that a trial court would have ordered the Debtor to pay for health insurance for the Defendant.

Next, the Defendant stated that he would have asked for one-half of the Debtor's vested pension rights from her employment at UPS. Because the Debtor's UPS pension was earned during the marriage, it constitutes a marital asset. It is very likely that a trial court would have awarded the Defendant one-half of the Debtor's UPS pension benefits. The evidence indicates that the present value of the Defendant's potential interest in the Debtor's pension account as of the Date of Dissolution was $9,217.02, which the Plaintiff factored into his analysis that the Debtor did not receive reasonably equivalent value in the dissolution.

■ The last argument made by the Defendant is that all of the credit card debt assigned to the Debtor in the Separation Agreement was her individual debt rather than marital debt and/or that the Debtor hid such debt from him. Accordingly, the Defendant argued that it was appropriate for the Debtor to assume liability for all credit card debt. The Court notes that the Separation Agreement is ambiguously worded, in that it provides, "Except as provided herein there is no *joint* marital debt." (Sep. Agmt. Art. 6) (emphasis added). Despite this wording, no marital debt was "provided herein." Both parties testified that only the Debtor had credit cards in her name (although the Defendant was an authorized user on these credit card accounts), which may be the reason the Separation Agreement refers to no "joint" marital debt. The Debtor testified that even though the credit cards were in her name, they were used for purchases that constituted marital debt, such as groceries, clothes and personal items for herself and for the Defendant, eating in restaurants, *etc.* She said that there were no large purchases on the credit cards.

The Debtor further testified that the Defendant knew about the credit cards even if he did not know the specific amount owing on each card. To the contrary, the Defendant stated that he was aware of only the one credit card that he carried in his wallet. He stated, however, that he did not use that credit card. The Defendant further testified that the Debtor did not disclose the number of credit cards or the amount of the credit card debt when the Separation Agreement was being negotiated and that he did not find out about the credit card debt until after the Debtor filed for bankruptcy protection. The Defendant argued that, because the Debtor had certain credit card statements mailed to her parents' address instead of the Marital Residence, he could not have known about the credit card debt. Mr. Bruno posited that, in a contested divorce, the Debtor's conduct in hiding the debt would be sufficient for a trial court to find that the Debtor was solely responsible for such debt.

The Court finds the Defendant's testimony to be self-serving, inconsistent with his exhibits and not credible. First, the

Defendant stated that he had no knowledge that the Debtor had more than one credit card until after the Debtor filed her bankruptcy petition in March 2009. This statement, however, is contradicted by the Defendant's own Exhibits 1, 2 and 3 [10]. Exhibit 1 is a letter dated July 15, 2008, from Capital One to the Debtor removing the Defendant from the Capital One credit card account. Exhibit 2 is a letter dated June 20, 2008, to the Debtor from AT & T Universal Card deleting the Defendant from that credit card account. Exhibit 3 is a letter to the Debtor from Sears Brands LLC dated October 13, 2008, confirming the Defendant's removal from the credit card account. The Debtor testified that she contacted these credit card companies at the Defendant's request. Thus, prior to signing the Separation Agreement at the end of July 2008, the Defendant had to have known about at least two of the credit card accounts. Exhibit 3 shows that he knew of a third credit card no later than October 2008. There is nothing in the record to support the Defendant's testimony that the Debtor and her counsel failed to apprise him of the credit card debt prior to entry into the Separation Agreement. Indeed, his own exhibits reflect the opposite.

■■■ More significantly, nothing in the record rebuts the presumption that the Debtor's credit cards were used for purchases that constituted marital debt.

A trial court must take into account marital debt when dividing marital property. * * * Assets and debts incurred during the marriage are presumed to be marital unless it can be proved they are separate. * * * The party seeking to establish that property (or debt) is separate rather than marital bears the bur-

den of proving this to the trial court. * * * Marital debt includes *a loan taken for any expenditure married couples make, such as buying a car or groceries or paying for cable television.* * * * *The determinative factor is whether the loan was incurred during the marriage.*

*Smith v. Smith,* 190 Ohio App.3d 335, 344–45, 941 N.E.2d 1233 (Ohio Ct.App.2010) (quoting *Nemeth v. Nemeth,* 2008 WL 2582517 at *8–9, 2008 Ohio App. LEXIS 2803 at *21–22 (Ohio Ct.App. June 27, 2008)) (internal citations and quotation marks omitted, emphasis in original). The Plaintiff and the Defendant stipulated that the Debtor's Schedule F listed credit card debt of $60,743.48. Schedule F lists a total of $89,098.41 in unsecured debt. Of the unsecured debt, all but the following are listed as credit card debt: ADT (Security)—$99.25; First Federal Credit Control (Medical)—$235.68; Larry & Shirley Neal (Loan)—$28,000.00. The Debtor scheduled Seven Seventeen as a checking account; however, Ms. Ross testified that a credit card was issued in connection with this account. The Defendant professed not to know if there was a credit card issued in connection with the Seven Seventeen checking account. If the Seven Seventeen debt is included with the other credit card debt, the total comes to $60,763.48, which is $20.00 more than the stipulated amount of $60,743.48. The Debtor further testified that the Capital One credit card debt in the amount of $2,558.91 was incurred subsequent to the dissolution. As a consequence, this Court calculates that, pursuant to the Separation Agreement, the Debtor assumed liability for credit card debt in the amount of $58,204.57 ($60,763.48 less $2,558.91 Capital One debt).

---

**10.** Although the Defendant did not offer any exhibits for admission into the record, Defendant's counsel used Exhibit 1 in cross-examining the Debtor. The Defendant's proposed Exhibits 1, 2 and 3 contradict his professed ignorance regarding the existence of the credit cards.

The Defendant bore the burden of proof to establish that debt incurred during the marriage was the Debtor's individual debt rather than marital debt. Despite this burden of proof, however, the Defendant offered no evidence that the credit cards were not used for marital debt. Indeed, the Defendant stated that he had no idea about the couple's financial situation and that he left all household finances in the hands of the Debtor. The Defendant testified that he did not know the cost of the utilities associated with the Marital Residence or the amount spent for groceries or clothing. The only basis offered by the Defendant for the proposition that all credit card debt would have been assigned to the Debtor in a contested divorce was his assertion of financial misconduct on the part of the Debtor.

█ Financial misconduct usually requires some action to dissipate, destroy, conceal or fraudulently dispose of assets.

In determining whether an equal division of the marital assets would be inequitable, a court may consider whether one party has engaged in financial misconduct. To that end, *R.C. 3105.171(E)(3)* provides that if a spouse has engaged in financial misconduct, including but not limited to, the dissipation, destruction, concealment or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property. The burden of proving financial misconduct is on the complaining party. This Court reviews a finding of financial misconduct under the manifest weight of the evidence standard.

*Smith v. Smith,* 190 Ohio App.3d 335, 345, 941 N.E.2d 1233 (Ohio Ct.App.2010) (internal citations omitted). In the *Smith* case,

the wife, without the consent of the husband, sold stock inherited by the husband and which at all times remained the husband's separate property. The wife also forged the husband's signature on the disbursement check and spent the proceeds without the husband's knowledge or consent. As a consequence, the appellate court upheld the trial court's finding the wife guilty of financial misconduct and required the wife to make the husband whole. In this case, the circumstances described by the Defendant of Ms. Ross having certain credit card statements sent to her parents' house does not rise to the level of financial misconduct found by the *Smith* Court.

The Defendant argued that a trial court would find financial misconduct because the Debtor had some credit card statements sent to her parents' home rather than the Marital Residence. The Debtor's mother, Shirley Neal, testified that, for approximately one to one-and-a-half years prior to the divorce, the Debtor received some mail at her parents' house. Mrs. Neal stated that she could not recall any of the return addresses on such mail, but she thought they were credit card statements. Other than this testimony, there was no evidence about the kind of mail the Debtor had delivered to the home of Mr. and Mrs. Neal. Most notably, there was no evidence that the mail sent to the home of the Debtor's parents constituted new credit card accounts [11] that previously had not been mailed to the Marital Residence. Although there was no evidence about why the Debtor directed some mail to be sent to her parents' house, there is an adverse inference that the Debtor took such action to conceal the credit card statements from the Defendant. However, based upon the Defendant's own testimony that he took no interest in the household finances, there is

---

11. Schedule F indicates marital credit card debt was incurred from "1/06" to "5/07."

no reason to believe that the Defendant would have been any more informed about the couple's credit card debt if the statements had all been mailed to the Marital Residence instead of the home of the Debtor's parents. Even if the adverse inference would have resulted in a division of the marital assets and debt that was not "equal," there is no basis to assume that, based upon such adverse inference, a trial court would have awarded all of the couple's equity in the Marital Residence to the Defendant and all of the couple's unsecured debt to the Debtor.

## D. Reasonable Equivalence in Bankruptcy

 The Decree provides, "[T]he Separation Agreement entered into by and between the Petitioners, having been found to be fair and equitable, is hereby approved and incorporated into this Decree in its entirety." (Am. Jt. Ex. A at 3.) Although not raised by the Defendant, it is clear that, despite this quoted language, the Decree does not preclude the Plaintiff's causes of action.

Ohio domestic relations courts, in making an equitable division of property in a divorce proceeding, apply a markedly different standard than the reasonably-equivalent-value test. All the following factors must be considered by a domestic relations court when a division of martial property is made:

(1) The duration of the marriage;

(2) The assets and liabilities of the spouses;

(3) The desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage;

(4) The liquidity of the property to be distributed;

(5) The economic desirability of retaining intact an asset or an interest in an asset;

(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;

(8) Any division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses;

(9) Any other factor that the court expressly finds to be relevant and equitable.

Thus, the test used to determine whether a transfer was supported by reasonably equivalent value focuses on whether there is a reasonable equivalence between the value of property surrendered and that which was received in exchange. Ohio domestic relations courts, in making a division of property, are not constrained by a reasonable equivalence standard. Rather, they may take into account a number of equitable factors that conceivably could produce a division of marital property that would satisfy the requirements of Ohio Rev.Code. Ann. § 3105.171(F), yet not pass muster under the reasonable equivalence test. Given these divergent decisional standards, we believe that the Dissolution Decree cannot be accorded claim-preclusive effect.

*Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707–08 (6th Cir.1999) (citing Ohio Rev. Code Ann. § 3105.171(F) (Anderson 1996)).

 Thus, this Court must look at the actual division of property to determine if the Debtor received reasonably equivalent value for the assets she transferred to the Defendant and the liabilities she retained as a result of the Decree. In order to do

so, this Court will apply Bankruptcy Code concepts to consider the value exchanged by the Debtor and the Defendant. *Reisz v. Stinson (In re Stinson)*, 364 B.R. 278, 282 (Bankr.W.D.Ky.2007) ("[T]his court must be guided by the Sixth Circuit Court of Appeals' fundamental recognition that divorce proceedings and fraudulent conveyance proceedings encompass different policy objective, and, hence, 'divergent decisional standards.' Accordingly, this Court will apply only Bankruptcy Court concepts in considering 'value' exchanged between Defendant and Debtor and whether the same was reasonably equivalent.").

■ We begin by comparing the value of the assets the Defendant received with the value of what the Debtor received in the divorce. As set forth above, the Debtor received the following: (i) a single nine-year old vehicle, which was encumbered by a lien in the approximate amount of $11,000.00; (ii) unspecified personal property; (iii) unspecified bank accounts; and (iv) her retirement account from her former employer, UPS, the total present value of which was $18,434.04. In addition, the Debtor paid off the home equity line of credit in the approximate amount of $28,000.00 and she was responsible for all credit card debt incurred during the marriage in the amount of $58,204.57. Thus, the Debtor received, on a net basis, negative equity in the approximate amount of $78,770.53 (($11,000.00 + $28,000.00 + 58,204.57) less $18,434.04). The Defendant, on the other hand, received the following marital assets: (i) all equity in the Marital Residence, valued at $27,500.00 (after taking into account the first mortgage on the Marital Residence); (ii) at least four vehicles (to which no value was

assigned); (iii) unspecified personal property; (iv) unspecified bank accounts; and (v) no marital debt other than the mortgage secured by the Marital Residence. Thus, the Defendant received at least $27,500.00 in net value.

■ The Plaintiff ignores the negative equity in the vehicle retained by the Debtor and, as set forth above, no value was attributed to any of the vehicles the Defendant retained. It is appropriate to disregard the $11,000.00 debt secured by the Debtor's Pontiac because there was no testimony or other evidence about why the Debtor incurred this debt or for what purpose the funds were used. The Debtor acknowledged that the original auto loan for the Pontiac had been paid off and there was no evidence that this second loan was used for purposes that would constitute marital debt. With the elimination of the vehicles from the Court's analysis, the Debtor's negative equity is $67, 770.53 [12]. ($78, 770.53–$11, 000.00.) It is clear the Debtor did not receive reasonably equivalent value in the split of assets and liabilities in the divorce. As a consequence, because the Debtor did not receive reasonably equivalent value in the divorce, this Court must avoid the transfers and bring back to the bankruptcy estate the reasonably equivalent value of such transfers.

If the marital assets (excluding vehicles) and debts of the Debtor and the Defendant were split equally, the Debtor and the Defendant each would have received assets in the amount of $22,967.02, consisting of (i) one half of the net equity in the Marital Residence in the amount $13,750.00; and (ii) one-half of the present value of the

12. It is clear from this analysis that the Debtor either was insolvent at the time of the divorce or became insolvent at the time of the divorce. The Defendant argued that he had no knowledge that the split of assets and liabilities in the divorce would render the Debtor insolvent, but knowledge on the part of the Defendant is not required for there to be a fraudulent transfer. *See* 11 U.S.C. § 548(a)(1)(B)(i).

Debtor's UPS pension in the amount of $9,217.02. In addition, they each would have retained liability for unsecured debt in the amount of $43,102.29 ($58,204.57 credit card debt plus $28,000.00 home equity line of credit payoff = $86,204.57 divided by 2 = $43,102.29). As a consequence, the Debtor and the Defendant would each have had net negative equity of $20,135.27—*i.e.*, $22,967.02 less $43,102.29. An equal division of the marital assets and debt would have resulted in the Defendant receiving negative equity of $20,135.27 instead of net positive equity of $27,500.00. Thus, the Plaintiff is entitled to recover from the Defendant $47,635.27 as the reasonably equivalent value for transfers that resulted from the divorce.

### IV. CONCLUSION

The Plaintiff established that the Debtor did not receive reasonably equivalent value when she relinquished all equity in the Marital Residence and took on all unsecured marital debt, even when the value of the Debtor's retirement plan is taken into consideration. The Plaintiff has established all elements for this Court to avoid a fraudulent transfer under 11 U.S.C. § 548 and O.R.C. § 1336.05. The reasonably equivalent value of the voidable transfers the Debtor made to the Defendant in the divorce is $47,635.27. The Plaintiff is entitled to recover this amount from the Defendant.

An appropriate order will follow.

**IT IS SO ORDERED.**

### ORDER REQUIRING DEFENDANT TO TURNOVER PROPERTY TO THE TRUSTEE

Debtor Karen Elaine Neal filed a voluntary petition pursuant to chapter 7 of the Bankruptcy Code on March 11, 2009 (Doc. # 1, Main Case), and received a discharge on July 7, 2009 (Doc. # 24, Main Case). On June 18, 2010, Plaintiff Andrew W. Suhar, Trustee, filed Adversary Proceeding to Determine the Validity, Priority or Extent of a Lien or Other Interest in Property; to Avoid a Preferential Transfer, [ sic] to Recover Money or Property; to Obtain a Declaratory Judgment Relating to the Foregoing and Other Relief (Doc. # 1). On July 20, 2010, Defendant Craig Bruno filed Answer to Complaint Filed by Craig Bruno (Doc. # 7). Trial was held on October 31, 2011.

For the reasons stated in this Court's Memorandum Opinion entered on this date, the Court finds that the Plaintiff established that the Debtor did not receive reasonably equivalent value when she relinquished all equity in the Marital Residence and took on all unsecured marital debt, even when the value of the Debtor's retirement plan is taken into consideration. The Plaintiff has established all elements for this Court to avoid a fraudulent transfer under 11 U.S.C. § 548 and O.R.C. § 1336.05. The reasonably equivalent value of the voidable transfers the Debtor made to the Defendant in the divorce is $47,635.27. The Court hereby awards the Plaintiff $47,635.27 to be paid by the Defendant.