[Cite as *Davis v. Davis*, 2013-Ohio-1118.]

[Please see original opinion at 2013-Ohio-211.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| SANDRA L. DAVIS, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2011-G-3018** |
| CHARLES W. DAVIS, | : | |
| Defendant-Appellant. | : | |

Civil Appeal from the Geauga County Court of Common Pleas, Case No. 08 DC 1389.

Judgment: Modified and affirmed as modified.

*A. Pearce Leary*, 401 South Street, Building 4-A, Chardon, OH 44024 (For Plaintiff-Appellee).

*A. Clifford Thornton, Jr.,* PDC Building, 3659 Green Road, Suite #305, Beachwood, OH 44122 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} This appeal is from the final decree in a divorce action before the Geauga County Court of Common Pleas. Appellant, Charles W. Davis, raises issues regarding the distinction between separate property and marital property, the distribution of actual marital property, the payment of both temporary and permanent spousal support, and the payment of permanent child support.

{¶2} The parties to this appeal were married for approximately 13 years and

had one child, who is still a minor. Prior to the outset of their relationship, appellee, Sandra L. Davis, had no significant assets and was employed as a clerk in a grocery store.

{¶3} In the late 1980's, appellant was employed at the A.R. Davis Company, an insurance entity with its principal place of business in Beachwood, Ohio. The company was originally formed by appellant's grandfather, and was primarily owned by his father at that time. In addition to working as an agent and receiving yearly income from his commissions, appellant also owned stock in the insurance company.

{¶4} Separate from his interest in A.R. Davis, appellant had a number of other personal investments and brokerage accounts. Some of the funds in these investments stemmed from appellant's prior jobs and his inheritance from his mother. At one point after his marriage to appellee, appellant's various investments were collectively worth over one million dollars.

{¶5} Also prior to the marriage, appellant purchased a seven-acre horse farm in Newbury, Geauga County, Ohio. Besides the facilities for the horses, the property had a century-old home. Upon moving into the residence, appellant paid for a large number of improvements. All total, he invested $151,067 in the property before the parties were married in January 1995.

{¶6} Approximately four years before their actual wedding, appellee started to cohabitate with appellant at the Newbury residence. At that time, appellee quit her job at the store and began to assist appellant in the maintenance of the horse farm. After their marriage and the birth of their daughter, appellee continued to work solely at home until 2002, when she took a position as a bookkeeper with appellant's insurance

2

company.  She remained at this position until April 2009, approximately five months after she filed for divorce.

{¶7}  During the course of their marriage, the parties continued to make major improvements to the Newbury residence.  For example, at one point, they had the home moved to another location on the property.   As a result of the improvements, the parties had to refinance the mortgage on the residence at least four times over the 13-year period.  During that same time frame, the fair market value of the property increased at least $350,000.

{¶8}  Appellant also continued to be involved in a number of investments while the parties were married.  For example, he purchased 7.5 acres of land that was across the street from the marital residence.  After holding this tract for a few years, he split the land and sold it to two separate buyers at a substantial profit.

{¶9}  In 1996, approximately one year into the marriage, appellant purchased a share of stock in a Florida condominium complex.  This share entitled the couple to use a specific condominium unit, which they did for 11 years.  Ultimately, the complex was bought out by a new developer, and appellant made a profit of over $500,000 in the transaction.  These funds were then placed in a number of accounts at the brokerage firm appellant employed to monitor his investments.  In relation to one of the accounts, appellant and appellee agreed that the subject funds would be used for their daughter's education.

{¶10} Through the years, appellant continued to receive shares of stock in the insurance company from his father's living trust.  Furthermore, when appellant's father passed away in 2006, the remainder of his father's shares were distributed in

accordance with the trust and his will. As a result of these transactions, appellant essentially became the sole owner of the family insurance company.

{¶11} In early 2008, appellant decided to try to expand his company's business into Geauga County. To facilitate this move, appellant and appellee created a separate partnership entity. Through the partnership, the couple bought a building and property on a major county highway. Their plan was to rent the upper levels of the building to the insurance company for its new office space. To finance this purchase, they entered into a "margin" loan agreement with appellant's brokerage firm. They also used funds from their various accounts to make improvements to the building.

{¶12} In December 2008, appellee filed for divorce. Despite the pendency of the legal action, she continued to work at the insurance company through April 2009, when appellant terminated her employment. Appellee also continued to live in the Newbury marital residence with the parties' daughter. Appellant moved into the basement of the building they had just bought through the partnership entity. He then used marital funds to make improvements to the basement.

{¶13} The divorce case was assigned to a court magistrate for consideration. In January 2009, the magistrate issued a temporary support order, under which appellant was required to pay appellee $5,122 each month. This amount was intended to cover the mortgage on the marital residence, insurance for the home and appellee's car, and child support. Over the ensuing months, appellant asserted that the magistrate had set the temporary support order at a sum that was greater than his monthly income from the insurance company. When appellee was released from her employment with the family company three months later, the temporary support order was amended.

4

{¶14} Beginning in October 2009, the magistrate held five separate evidentiary hearings on the merits of the divorce. Based upon the evidence presented, the magistrate issued a 50-page written decision. As to the distribution of the marital property, the magistrate found the total value of the marital assets to be $857,684. The magistrate then recommended that $553,372 of the assets be given to appellant, including the marital residence and the insurance company shares. In turn, $225,892 of the assets would be given to appellee, including the majority of the funds in the various brokerage firm accounts. Additionally, appellant would be required to pay appellee the sum of $124,530 to equalize the distribution.

{¶15} Both sides objected to the magistrate's decision. Upon due consideration, the trial court overruled the majority of the objections, except as to the disposition of the funds in the "school" brokerage account for the daughter. The trial court then rendered the final divorce decree, adopting the majority of the magistrate's recommendations.

{¶16} Appellant advances the following twelve assignments of error:

{¶17} "[1.] The trial court erred in ordering the appellant to pay more each month than his income both in temporary orders; throughout the case, and in the final decree.

{¶18} "[2.] The trial court erred by failing to exclude from marital property and return to the appellant the $151,067.00 of traceable pre-marital funds appellant put into the Music Street property prior to the marriage along with passive appreciation on the investment.

{¶19} "[3.] The trial court erred and abused its discretion for failing to average the parties' two appraisals and for acting as an expert witness for the appellee.

{¶20} "[4.] The trial court erred in finding the stock in the A.R. Davis Company,

5

that appellant received from his father as gifts while his father was alive and from his father's living trust at his death, to be marital property, and in acting as appellee's expert witness [in] attempting to value the stock.

{¶21} "[5.] The trial court erred in failing to return to appellant his traceable investment of separate property into the purchase of the parties' Florida condominium.

{¶22} "[6.] The trial magistrate and trial court erred in finding the appellant guilty of financial misconduct.

{¶23} "[7.] The trial court erred in failing to order the appellee to take the unemployment that was offered to her upon her termination from the A.R. Davis Company.

{¶24} "[8.] The trial court erred in awarding spousal support in the sum of $2,500 per month for six years.

{¶25} "[9.] The court erred in ordering the special account the parties had set aside to finance their only child's education to be divided between the parties.

{¶26} "[10.] The trial court erred in giving $35,000 to appellee on motion without holding a hearing.

{¶27} "[11.] The court abused its discretion in ordering $20,000 to be credited to appellant's distribution of the assets.

{¶28} "[12.] The court erred by arbitrarily inflating appellant's income for purposes of determining child support."

{¶29} Under his first assignment, appellant contends that, in setting the amount of the temporary and final support orders, the court magistrate exhibited a definitive bias against him. Specifically, he states that, though he presented considerable evidence to

the contrary, the magistrate found that his monthly income from his job at the insurance company was sufficient to pay over $5,000 in total support. According to him, the magistrate's blatantly incorrect decision was based upon the fact that he was a personal acquaintance of appellee's trial counsel, in that the two men had a history of riding bikes together on weekends.

{¶30} As a general proposition, an appellate court does not have the authority to review claims of bias or other types of judicial misconduct on the part of a trial judge or magistrate; instead, such legal power lies solely with the Supreme Court of Ohio. *See Catanzarite v. Boswell*, 9th Dist. No. 24184, 2009-Ohio-1211, ¶7-9. Hence, the scope of this court's review of the magistrate's decision as to the extent of appellant's income must be limited to determining if any errors occurred in either weighing the evidence or applying the pertinent law. Although appellant's argument contains some discussion of the alleged relationship between the magistrate and appellee's trial counsel, we are not permitted to address this point in deciding the merits of this appeal.

{¶31} Appellant has also raised the "income" issue as part of his challenge to the spousal support orders under his sixth assignment and the child support orders under his twelfth assignment. Since the matter will be fully discussed at that time, and decided for the reasons stated therein, appellant's first assignment does not have merit.

{¶32} Under his second assignment, appellant submits that the magistrate erred in concluding that the entire value of the marital residence had to be characterized as a marital asset. He maintains that part of the residence's value should have been found to be separate property because he presented evidence demonstrating that he invested $151,067 in both the home and land prior to the date of the parties' marriage in January

7

1995.  In support of this point, appellant asserts that, despite the fact that the mortgage on the property was refinanced on numerous occasions during their marriage, the funds in question were traceable to his original investment.

{¶33} Pursuant to R.C. 3105.171(B), as part of a divorce proceeding, a trial court is obligated to divide both the marital and separate property between the two spouses in an equitable manner.  In construing this statutory requirement, this court has previously indicated that the distribution of all property for purposes of a divorce lies within the trial court's sound discretion.  *Thorp v. Thorp*, 11th Dist. No. 2010-T-0038, 2011-Ohio-1015, ¶27.  As a result, a "distribution" order can be reversed on appeal only when an abuse of discretion has been established.  *Id.*

{¶34} "The trial court's characterization of property as either marital or separate necessarily involves a factual inquiry under a manifest weight of the evidence standard. * * *.  An appellate court will not reweigh the evidence, but instead will uphold the findings of the trial court when the record contains some competent and credible evidence to support the court's conclusions.  * * *."  (Citations omitted.)  *Boyles v. Boyles*, 11th Dist. No. 2002-P-0097, 2003-Ohio-5351, ¶18.

{¶35} As relevant to the issue raised in this assignment, R.C. 3105.171(A)(6)(a) defines "separate property" to include any real and personal property which one spouse acquired before the parties were married.  After the first spouse has submitted evidence satisfying the foregoing definition, the burden transfers to the second spouse to prove by clear and convincing evidence that the separate property was given to her/him during the marriage.  *Brady v. Brady*, 11th Dist. No. 2007-P-0059, 2008-Ohio-1657, ¶24.  In attempting to show that a gift was made, the second spouse cannot rely solely upon the

8

fact that title to the disputed property was transferred to her/him. *Id.*

{¶36} Under present Ohio law, the primary means for deciding whether an asset is marital or separate property is traceability. *Price v. Price*, 11th Dist. No. 2000-G-2320, 2002-Ohio-299, ¶10. "In the process of tracing ownership of a particular asset, the court must evaluate such factors as each party's basis for his or her claim of an ownership interest (*e.g.*, by contract, by gift, etc.). The party attempting to prove that the asset is traceable separate property must establish such tracing by a preponderance of the evidence. * * *. The party seeking to prove that he or she has a property interest by contract or gift has the burden of proving such claimed property interest. * * *." (Citations omitted.) *Id.* at ¶11.

{¶37} In our case, the court magistrate essentially agreed with appellant that, prior to his marriage to appellee, he had already purchased the marital residence and paid for certain improvements to the home. Nevertheless, the magistrate still found that none of the property's present value should be designated as a separate asset. As the grounds for his factual finding, the magistrate noted: (1) after the parties had been married, appellant had conveyed his entire interest in the property to appellee, who later conveyed a one-half interest back to him; (2) during the marriage, the parties refinanced the mortgage on the property on a number of occasions, and had used the proceeds of the new loans to make significant improvements to the entire property; (3) appellant did not present any evidence regarding the fair market value of the property when the new loans were executed; and (4) as a result, appellant could not establish that any of his original equity had survived the post-marriage refinancing. In light of this analysis, the magistrate ultimately concluded that appellant had failed to carry his burden of tracing

9

his separate interest in the marital residence.

{¶38} In order for a spouse to demonstrate that his pre-marital contribution to the purchase of a home has remained separate property, he must be able to "trace" those initial funds to the present equity. *Jones v. Jones*, 4th Dist. No. 07CA25, 2008-Ohio-2476, ¶21. In this instance, a review of the trial transcript confirms that appellant never demonstrated that, during the period in which the mortgage on the tract was refinanced multiple times in order to make additional improvements, the value of the property had always been sufficient to cover his original separate equity. Under such circumstances, the magistrate could justifiably conclude that the present equity of $160,000 could only be attributed to the payments the parties made on the various loans during their marriage. Accordingly, since the trial record before this court supports the magistrate's ultimate finding that appellant's separate property interest in the marital residence was not traceable, his second assignment is without merit.

{¶39} Under his next assignment, appellant challenges the magistrate's factual finding concerning the fair market value of the marital residence. During the evidentiary hearing before the court magistrate, each side presented the testimony of a real estate appraiser who produced a report on the current value of the residence. As part of his findings in his subsequent decision, the magistrate concluded that the testimony of appellee's appraiser, Cynthia Casto, was most credible, and thus adopted the value Casto assigned to the property. Appellant submits that, because the testimony of his appraiser, Timothy Webber, was equally credible, the magistrate should have based its ultimate finding on the average of the two values cited by the appraisers.

{¶40} "The valuation of property in a divorce case is a question of fact. Thus,

the issue is subject to review under a manifest weight of the evidence standard. * * *. Consequently, the trial court's judgment will not be reversed as long as it is supported by some competent, credible evidence. * * *. This standard of review is highly deferential and even 'some' evidence is sufficient to sustain the judgment and to prevent a reversal." (Citations omitted.) *Covert v. Covert*, 4th Dist. No. 03CA778, 2004-Ohio-3534, ¶6.

{¶41} As to the use of a particular method of determining an asset's value, a trial court has no obligation to adopt or follow any specific method of valuation. *Huelskamp v. Huelskamp*, 185 Ohio App.3d 611, 2009-Ohio-6864, ¶27 (3rd Dist.). Thus, when a "value" question is raised on appeal, the task of the appellate court "'is not to require the adoption of any particular method of valuation, but to determine whether, based on all relevant facts and circumstances, the [trial] court abused its discretion in arriving at a value.'" *McLeod v, McLeod*, 11th Dist. No. 2000-L-197, 2002-Ohio-3710, ¶61, quoting *James v. James*, 101 Ohio App.3d 668, 681 (1st Dist.1995). Pursuant to the foregoing precedent, an abuse of discretion cannot be deemed to have occurred when the trial court's "value" determination is supported by some competent, credible evidence. *Huelskamp*, at ¶27.

{¶42} When the parties to a divorce action present conflicting evidence as to the value of an asset, the trial court is not permitted to arbitrarily choose a value somewhere between the two extremes. *Covert*, at ¶29-30. Instead, the adoption of an intermediate sum is only permissible if the trial court can provide a logical rationale for such a decision. *Id*. Hence, in considering the respective testimony of the parties' competing expert witnesses in the instant case, neither the magistrate nor the trial court had a legal

duty to predicate its valuation of the marital residence upon the average of the two values cited by the experts.

{¶43} In testifying for appellee, Casto opined that the decision of a prospective buyer to purchase the marital residence would likely turn on the unique characteristics of the property. In support of this point, Casto referred to the fact that the property had a century-old home and the facilities for raising horses. In light of this, in attempting to find recent sales of other homes that were comparable to the parties' residence, she did not limit her search to the particular township where the land was located; instead, she expanded her search to sales in neighboring communities which involved similar tracts of land. As a result of her consideration of other sales involving horse farms, her report concluded that the fair market value of the marital residence was $540,000.

{¶44} In contrast, appellant's expert, Timothy Webber, stated that the decision to purchase the home in question would not be based upon the unique characteristics of the land, but would instead turn on typical considerations, such as the type of schools in the area and the property's proximity to a major city. Consequently, Webber limited the scope of his search for comparable sales to the specific township in which the land was located. In turn, since only one recent sale in the township had involved a horse farm, Webber considered recent sales where the tracts of land were substantially smaller and did not have any additional buildings. As a result, his report found that the marital residence was only worth $500,000.

{¶45} In ultimately finding that the current fair market value of the residence was $540,000, the magistrate basically concluded that Casto's report was entitled to greater weight because her analysis was more logical; i.e., the property's unique characteristics

would be more appealing to a potential buyer than its general location. Upon reviewing Casto's entire testimony in the trial transcript, this court holds that her appraisal of the residence and accompanying land did not contain any inherent inconsistencies which would render her analysis unbelievable. Moreover, the magistrate gave a logical reason for accepting Casto's analysis of the "fair market value" issue over Webber's analysis. Therefore, since the trial record contains some competent, credible evidence supporting the magistrate's ultimate finding as to the value of the residence, appellant has failed to demonstrate any abuse of discretion on the "value" issue. Appellant's third assignment lacks merit.

{¶46} Under his fourth assignment, appellant challenges the magistrate's finding that certain stock he received from his father should be designated as marital property. During the final evidentiary hearing, it was established that appellant owned 730 shares of stock in his insurance company, 520 of which had been transferred to him during the course of the disputed marriage. Of those 520 shares, he received 75 directly from his father's living trust during his father's lifetime. The remaining 445 shares were obtained when his father died in 2005. In contending that all 520 shares should have been found to be his own separate assets, appellant emphasizes that, as part of testimony at trial, he expressly stated that his father intended for the stock to belong solely to him.

{¶47} Of the 730 total shares, the evidence showed that 210 were given to appellant prior to the outset of the marriage; accordingly, there was no dispute that the 210 shares were his separate property. As to the 75 shares received during the course of the marriage while the father was still living, the court magistrate concluded that: (1) the shares had to be treated as inter vivos gifts; and (2) appellant failed to prove by

13

clear and convincing evidence that the gifts were meant solely for him. Regarding the 445 shares received after the father's death, the magistrate similarly concluded that appellant failed to demonstrate by a preponderance of the evidence that the shares were bequeathed or transferred solely to him. As to the latter point, the magistrate noted that, despite the fact that the language of his father's will or the living trust agreement could have readily established whether only appellant inherited the 445 shares, he did not introduce either document into evidence. In essence, the magistrate held that appellant's testimony failed to persuade him that the property was separate.

{¶48} After appellant objected to both aspects of the magistrate's analysis, the trial court upheld the determination that all 520 shares should be viewed as marital assets for purposes of the property distribution. In relation to the alleged inheritance of the 445 shares, the trial court's separate judgment on the parties' objections contained the following discussion:

{¶49} "As the Magistrate observed, where's the will, where's the trust agreement, where's any documentary evidence that there was a bequest or a grant to a trust beneficiary? At the risk of being overly repetitious, the burden of proof was upon [appellant] to show by a preponderance of the evidence that the 445 shares of stock were inherited by him from his father. A stock ledger is neither probative nor reliable to meet that burden."

{¶50} In contesting the disposition of all 520 shares, appellant does not dispute the fact that a separate analysis must be applied to each set of stock. Regarding the 75 shares which were transferred before the father's death and after marriage, appellant never asserted that he paid any funds for these shares; hence, this set of stock was

14

clearly an inter vivos gift from the father. In light of this, the proper characterization of the 75 shares, as it relates to the distribution of the parties' marital property, is governed by R.C. 3105.171(A)(6)(a)(vii), which defines the term "separate property" to include "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse."

{¶51} In attempting to satisfy the foregoing statutory burden, appellant presented only two items of evidence at trial pertaining to the transfer of the 75 shares. First, he testified that his father had intended to give the stock solely to him. Second, appellant submitted a certified copy of his "share ledger" with the A.R. Davis Company. This one-page document sets forth a list of all company stock belonging to appellant, and gives a brief statement concerning the origin of each set of stock transferred to him. As to the 75 shares in question, the share ledger indicates that, on five occasions between December 1997 until January 2001, 15 shares of company stock were transferred from Albert R. Davis to appellant.

{¶52} In relation to the share ledger, appellant notes that the document does not contain any reference to appellee; based upon this, he asserts that the ledger showed that his father meant for the 75 shares to only be a gift to him. Regarding this point, although the ledger states the person or entity from whom each set of stock had been transferred to appellant, it does not provide any description of the underlying transaction. That is, the share ledger does not indicate whether the disputed shares were given to appellant or sold to him. Hence, the magistrate and the trial court could have justifiable concluded that the share ledger had no probative value for the purpose

15

of establishing the manner in which the 75 shares had been acquired.

{¶53} Besides the copy of the share ledger, appellant did not present any other documentary evidence to support his contention that the 75 shares were given solely to him. As both the magistrate and trial court noted in their respective analyses, since it was appellant's position that each of the 75 shares had been transferred to him from his father's living trust, appellant could have demonstrated the nature of transfers through the submission of a copy of the living trust agreement into evidence. During the course of the trial, appellant did not attempt to provide any explanation as to why a copy of the agreement was not provided.

{¶54} In researching this point, this court has not located any Ohio authority for the proposition that testimonial evidence is not sufficient to prove a gift of property when existing documentary evidence is not introduced. Nevertheless, it was still clearly within the sound discretion of the trial court magistrate to reject appellant's "gift" testimony in the absence of any supporting documentary evidence. That is, the magistrate and the trial court could justifiably conclude that because appellant did not introduce a copy of an easily-accessible document, that failure deprived his testimony of all credibility.

{¶55} A similar analysis applies to the remaining 445 shares of the disputed stock that the trial court deemed marital property. At trial, appellant testified he inherited this set of shares when his father died. Pursuant to R.C. 3105.171(A)(6)(a)(i), the term "separate property" also includes "[a]n inheritance by one spouse by bequest, devise, or descent during the course of the marriage * * *." In contrast to the statutory provision governing gifts during the marriage, the "inheritance" provision does not require the presentation of clear and convincing evidence as to the issue of whether the property in

16

question was bequeathed to one spouse. Nonetheless, given the general presumption that property obtained during the course of the marriage is considered a marital asset, it follows that appellant still had the basic burden of establishing by a preponderance of the evidence that the "inheritance" exception was applicable to the 445 shares.

{¶56} In addition to his testimony about the alleged inheritance, appellant again relied upon the copy of the share ledger. In relation to the transfer of the 445 shares, the ledger only stated that the stock in question had come from the father's living trust. The ledger gave no indication as to whether the shares were inherited pursuant to the father's will or the living trust agreement. Therefore, since the share ledger did not describe the nature of the underlying transaction, it had little probative value as to whether the 445 shares had been inherited solely by appellant.

{¶57} As to the probative value of appellant's "inheritance" testimony, this court would again emphasize that, despite the fact that there was nothing to indicate that the father's will or living trust agreement were no longer readily accessible, appellant failed to introduce copies of those documents into evidence before the magistrate. Given that either of those documents could have easily explained the nature of the transfer of the 445 shares, the magistrate was permitted to conclude that appellant was not being totally forthcoming on the issue, and thus that his testimony as to his sole inheritance of the 445 shares was completely lacking in credibility.

{¶58} Upon reviewing the entire transcript of the evidentiary hearing, appellant is unable to demonstrate that the court's factual findings were not supported. The magistrate did not err in finding that the 520 shares of stock were marital assets subject to distribution.

{¶59} As part of this assignment, appellant also contests the magistrate's distinct finding that the present fair market value of all 520 shares of the A.R. Davis Company stock was $170,000. During the evidentiary hearing, neither side presented evidence as to the current value of the company shares; instead, the evidence on this point was limited to a 2006 report of an expert, who had determined that the value of all company shares at that time was $161,900. In rendering his finding regarding the present value, the magistrate stated in his written decision that he followed the same methodology as the expert, but modified the formula to account for the fact that appellant had paid the majority of the company's debt over the interceding three years.

{¶60} Appellant maintains that the magistrate was acting in a biased manner when he tried to use the expert's methodology to derive a present fair market value for all 520 shares. However, our review of the trial record supports the conclusion that the magistrate was merely acting within the scope of the trial court's broad discretion in setting a value for an asset which had been found to be part of the marital estate. As to this point, it should be noted that, under Ohio law, "[a] trial court has broad discretion to develop a measure of value when dividing marital property." *Covert*, 2004-Ohio-3534, at ¶16, As the trier of fact, the court magistrate had an obligation to go forward on the "valuation" question regardless of the dearth of evidence concerning the present fair market value of the 520 shares.

{¶61} In deriving the fair market value of all company shares in 2006, the expert determined that the value of a privately-owned insurance agency, when sold on the open market, would be roughly equal to 57 percent of the average of its gross revenues over a three-year period. The expert then lowered that figure to 50 percent in light of

18

certain negative factors applicable to the A.R. Davis Company as of 2006. In using this method to calculate an up-to-date fair market value, the magistrate decided to raise the figure to 52 percent to account for the fact that the financial condition of the company improved in the intervening years.

{¶62} Given the limited evidence submitted on the "value" issue, the magistrate's analysis was appropriate under the circumstances. Furthermore, his slight modification of the percentage multipler was warranted. Because appellant has failed to demonstrate an abuse of discretion as to the value of the insurance company stock, his fourth assignment is not well taken.

{¶63} Appellant's fifth assignment asserts another issue concerning the magistrate's characterization of a condominium as marital property. One year after the parties' honeymoon, appellant bought a share in a Florida condominium complex for $67,000. This share gave the parties the right to occupy and use a unit in the complex, which they did for eleven years until appellant sold the share for $566,000. In now maintaining the magistrate erred in concluding the proceeds of the sale should be considered marital property, appellant argues the magistrate should not have rejected his testimony that he planned to buy an interest in the complex long before the couple was married.

{¶64} Conflicting testimony was given concerning why the condominium share was bought. Appellee testified that she and appellant stayed at the complex during their honeymoon, and that they specifically decided to buy a share at that time as a gift to each other. She further stated that they tried to buy the share immediately, but they were placed on a waiting list and were not given the chance to make the actual

purchase until one year later. On the other hand, appellant testified that he had been taking vacations at the Florida complex prior to the marriage, and that he had always planned to purchase a share for himself when the time was right.

{¶65} In finding that appellee's version was more credible, the magistrate noted that her assertion that the purchase was meant as a wedding gift was more consistent with the facts surrounding the culmination of the deal; i.e., their name was placed on the waiting list immediately after their honeymoon, and the purchase was made a year later. In other words, if appellant had always intended to personally buy into the complex, it would be peculiar that he would decide to take the first step so soon after the couple's honeymoon. Moreover, the evidence at trial supported the magistrate's conclusion that appellant failed to establish that he used his own personal investment funds to buy the share. Although appellant produced a document indicating that he withdrew the sum of $73,000 from a pre-existing account during the same period in which the "share" purchase was completed, he was never able to show that the $73,000 was transferred for that exact purpose.

{¶66} Under Ohio law, an asset acquired during the marriage will be presumed to be marital property unless the spouse challenging the characterization can establish a different intention by clear and convincing evidence. *Boyles*, 2003-Ohio-5351, at ¶35. In light of the foregoing, the magistrate did not err in finding appellant failed to carry this burden regarding the Florida condominium. That is, he failed to show by clear and convincing evidence that the couple did not intend for the condominium share to be an asset of their marriage. For this reason, appellant's fifth assignment is without merit.

{¶67} Under his next assignment, appellant asserts the magistrate erred in

20

concluding that he engaged in financial misconduct while the divorce proceedings were pending. As the primary basis for this conclusion, the magistrate found that, even though appellant was ordered in a temporary ruling at the outset of the case to pay the monthly mortgage payment, he failed to do so on four occasions before the final evidentiary hearing. According to appellant, he was unable to make the mortgage payment because, in setting the total amount of the temporary support order, the magistrate miscalculated his monthly income. As noted above, this alleged miscalculation was the grounds for appellant's contention that the support order was the result of improper bias on the part of the magistrate.

{¶68} A review of the entire trial record shows that, in making his determination as to amount of appellant's monthly income, the magistrate predicated his calculation upon his finding that appellant's yearly income as an employee/owner of the insurance company was $116,760. This figure was the average of appellant's yearly income over the three-year period of 2006-2008. Throughout the entire litigation, appellant asserted that the magistrate's reliance upon this average figure was misplaced because his net monthly income fell drastically during 2009. He blamed this drop in income upon a general decline in his company's business due to the sluggish national economy. He further maintained he had to cut the percentage of his commissions in order to keep the company financially solvent.

{¶69} In his final written decision, the magistrate rejected appellant's contention about the decline in his yearly income. First, the magistrate found that any reduction in the insurance company's 2009 revenues were negligible. Second, the magistrate found that, if the company was having any cash-flow problems, it was primarily due to

21

appellant's decision to liquidate the company's prior debt. Third, the magistrate found the company incurred a number of unusual expenses during 2009 due to appellant's decision to open a new office in Geauga County. Accordingly, the magistrate concluded that the 2009 figures were not as good of an indicator of appellant's earning ability as the average of the prior three years.

{¶70} Taken as a whole, our review of the trial transcript indicates that appellant produced some evidence showing the amount of his basic income from the insurance company had been declining over the first nine months of 2009. On the other hand, our review also confirms that there was some evidence from which the court magistrate could properly find the decrease in the company's income was not due to a steady decline in business, but instead, was caused by a number of unusual events which were very unlikely to occur again in the future. For example, besides getting the Geauga County office open and efficiently running, it was established that appellant was changing his company's primary insurance carrier. This meant that the company had to contact many of its customers and go through the process of writing new policies with the new carrier after the existing policies expired. As a result, there existed some competent, credible evidence from which the magistrate could draw the conclusion that the decrease in income was a temporary fluctuation, and that the average from the prior three years was the best indicator of appellant's financial situation.

{¶71} Before this court, appellant maintains the continuing decline of the national economy has decreased his business further. However, in issuing his written decision following the final evidentiary hearing in November 2009, the magistrate could not base its findings upon any economic forecast; instead, he had to predicate his finding as to

22

appellant's yearly income on the evidence presented.

{¶72} In ordering appellant to pay the monthly mortgage payment as part of the temporary support order, the magistrate was granting a form of spousal support. Prior to rendering an order of spousal support, a trial court is required to make findings as to the annual income of the two parties. *Zornes v. Zornes*, 12th Dist. No. CA2005-05-042, 2006-Ohio-877, ¶13. For purposes of spousal support, the Revised Code and the case law of this state do not provide a general definition of the term "income;" therefore, a trial court possesses some discretion in deciding what may be viewed as income. *Freeland v. Freeland*, 4th Dist. No. 02CA18, 2003-Ohio-5272, ¶16. As to the method to be employed in making the "income" determination, a trial court does not abuse its discretion when its calculation is predicated upon an average figure stemming from a reasonable period of years. *Nagel v. Nagel*, 9th Dist. No. 09CA009704, 2010-Ohio-3942, ¶34.

{¶73} Given the state of the evidence in this case, the magistrate and trial court did not abuse their discretion in concluding the three-year average was the best indicator of appellant's present earning capability. In other words, the finding of a yearly income of $116,760 was supported by competent, credible evidence. Since appellant had sufficient income to cover the monthly mortgage payment on the marital residence, the magistrate did not err in also finding that he had engaged in financial misconduct.

{¶74} As a separate issue under this assignment, appellant also challenges the magistrate's finding that he committed financial misconduct when he failed to make the monthly payments on a separate margin loan for which both parties were liable. When appellant decided in 2008 to expand the insurance business into Geauga County, he

23

and appellee formed a separate partnership entity for the purpose of obtaining a building on a heavily-travelled county road. The partnership then leased a portion of the building to appellant's insurance company for its new office. To finance the purchase of the building, appellant and appellee executed a margin loan with their investment broker, under the terms of which they were only liable for a monthly interest payment of $1,200.

{¶75} In essentially claiming the partnership lacked sufficient funds to make the interest payments during the 2009 fiscal year, appellant submits that the lack of funds was caused by the magistrate's own order halting appellant's separate monthly payment of $800 to the partnership as rent for his use of the building's basement as his new home. It is appellant's position that if he had been permitted to continue the $800 payments, the partnership would have had sufficient funds to make the monthly interest payments on the margin loan.

{¶76} However, the respective testimony of both sides at trial readily indicated that the $1,200 monthly rent payment from appellant's insurance company was meant to cover the interest payment on the margin loan. Furthermore, no other evidence was submitted tending to show that the extent of the other monthly bills associated with the building were such that appellant would not have been able to pay them with his personal funds. Accordingly, since the evidence established that the partnership still should have been able to make the monthly loan payments even without the $800 rent payments, the magistrate's finding of financial misconduct was not against the manifest weight of the evidence.

{¶77} Under Ohio law, "[a] trial court enjoys broad discretion in deciding whether

or not to compensate one spouse for the financial misconduct of the other." *Hvamb v. Mishne*, 11th Dist. No. 2002-G-2418, 2003-Ohio-921, ¶14. Pursuant to the foregoing analysis, appellant has failed to establish an abuse of discretion on the part of the magistrate or trial court regarding his failure to make the two monthly payments in question. Appellant's sixth assignment is not well taken.

{¶78} Under his seventh assignment, appellant contests the temporary spousal support order he was required to pay during the majority of the time the divorce action was pending. Appellant primarily challenges the magistrate's finding that the need for temporary spousal support was attributable to him because his decision to fire appellee from her position with the insurance company was unjustified. According to appellant, the evidence before the magistrate supported a finding that his actions to terminate appellee were warranted. In light of this, he submits he should not have been required to pay any support to her because she was entitled to receive state unemployment benefits.

{¶79} Under the magistrate's initial temporary support order, appellant was not required to pay any temporary spousal support to appellee because she was still working as a bookkeeper at the family insurance agency. However, approximately three months after the initial order was issued, appellant terminated appellee's position with the company. Based upon this development, appellee moved for an increase in the temporary support order. During the subsequent hearing before the magistrate, appellee testified that, despite the fact that she was entitled to receive unemployment benefits, she did not intend to collect the benefits because it might harm her credit standing. Appellant testified that he believed it was necessary to terminate appellee

25

because she should not be allowed to have access to the agency's documents.

{¶80} In the interim entry of June 23, 2009, the magistrate held that appellant's termination of appellee's employment was not justified; resultantly, appellant was ordered to pay temporary spousal support of $2,000 per month, an amount slightly less than appellee's net pay with the company. Regarding appellant's assertion that the firing was necessary to protect company documents, the magistrate noted that appellant had not alleged appellee tried to alter any company documents or take any agency funds. Therefore, the magistrate found that appellant's asserted reasons for terminating her were "fatuous" because she would have access to all company documents anyway through discovery in the pending case. Additionally, the magistrate found that appellant had not raised any issues about the quality of appellee's work or whether the company had sufficient funds to continue to employ her.

{¶81} Appellant now argues that appellee was not a good employee, and that she was beginning to make derogatory comments about him to some of the company's clients. However, a review of the entire record demonstrates that appellant did not testify as to these specific points until the final evidentiary hearing in October/November 2009. Thus, since the magistrate and the trial court did not have the opportunity to consider these points prior to rendering the temporary spousal support order, appellant's subsequent testimony will be not be considered as part of this court's review.

{¶82} During the evidentiary hearing on appellee's request to modify the interim order, appellant only testified that he decided to terminate appellee because he was uncomfortable that she would have continuing access to the agency's financial records

26

throughout the divorce proceeding. In now arguing that this testimony alone constituted a legitimate reason for the termination, appellant contends that, during the four-month period in which she continued to work for the company following the filing of the divorce action, appellee used her access to the records to create a separate document that misrepresented the current financial status of the agency.

{¶83} In concluding that the concern over continuing access was not a justifiable reason for appellant's actions, the magistrate emphasized that firing appellee would not terminate her access to the financial records because she would be entitled to see them as part of discovery in the action. Given that the temporary spousal support order was rendered at a stage of the case when the magistrate would not have been aware of any potential arguments as to whether the insurance company was separate property, the magistrate's decision was justified; i.e., since the financial records of a "marital" business would typically be subject to discovery in a divorce proceeding, appellee would be able to review them regardless of the status of her employment. Moreover, appellant never testified that appellee tried to alter the agency books or otherwise posed a threat to the business; instead, he has only asserted that she had used the information in the financial records to create an inaccurate analysis about the present status of the business. In light of the fact that the quality of appellee's analysis would not affect her right to scrutinize the company books, the magistrate properly concluded that appellant failed to state a legitimate reason for dismissing appellee as a company employee.

{¶84} In conjunction with the foregoing, at the beginning of the instant case, appellant and appellee were able to set aside their differences and continue to work together at the insurance agency. Based upon this, in setting the initial temporary

support order, the magistrate did not require appellant to pay spousal support because appellee was still receiving income from the agency. Consequently, when appellant chose to end appellee's employment, it had the clear effect of changing the status quo, thereby thwarting the underlying logic of the first temporary order.

{¶85} As a general proposition, this court would agree with appellant's assertion that, when a party to a divorce action becomes unemployed, he or she would have an obligation to mitigate the loss of income by collecting unemployment compensation. In this instance, though, appellee's unemployment was not due to the determination of an unrelated third party, but was caused directly by appellant. Furthermore, in subsequently attempting to explain his decision during the evidentiary hearing, appellant could not demonstrate that the underlying facts regarding appellee's employment significantly changed during the four months in which she continued to work at the agency despite the pendency of the divorce action. In other words, he failed to establish a change in circumstances which warranted depriving appellee of her monthly income without providing for any form of substitute support.

{¶86} Given that appellant's testimony during the motion hearing was insufficient to state a legitimate reason for ending appellee's employment, the court magistrate did not abuse his discretion in refusing to count the unclaimed unemployment benefits as income which would cancel the need for temporary spousal support. To the extent that appellant has not shown any error in the magistrate's analysis, his seventh assignment is not well taken.

{¶87} Under his eighth assignment, appellant challenges the merits of the court magistrate's final spousal support order, under which he is obligated to pay appellee the

sum of $2,500 each month for a period of six years. R.C. 3105.18(B) provides that, as part of its jurisdiction over a divorce action, a court of common pleas has the authority to grant "reasonable" spousal support to either spouse upon proper request. In light of the statutory language, this court has stated that, in setting the amount of spousal support, the relevant inquiry for the trial court is whether the award is appropriate and reasonable under the circumstances. *DiNunzio v. DiNunzio*, 11th Dist. No. 2005-L-124, 2006-Ohio-3888, ¶54. On appeal, the determination of spousal support is again reviewed under an abuse of discretion standard. *Slobody v. Friedland-Slobody*, 11th Dist. No. 2007-G-2777, 2008-Ohio-3395, ¶20. Pursuant to this standard, the trial court's ruling will not be reversed unless it is shown to be unreasonable, arbitrary or unconscionable. *Id.*

{¶88} In his first challenge to the spousal support award, appellant submits that requiring him to pay for a six-year period is unjustified because his marriage to appellee only lasted thirteen years. As to the duration of their relationship, this court would note that there was no dispute that, prior to their marriage in January 1995, the parties lived together in appellant's "Music Street" residence. During that four-year phase, appellee did not work outside the home; instead, she assisted in the maintenance of the horse farm. Moreover, appellee was totally dependent upon him for financial support. Hence, the evidence supported the conclusion that the parties were functioning as husband and wife as of 1991.[1]

{¶89} Appellant maintains that the four-year cohabitation should not be deemed part of their actual marriage for purposes of determining the length of spousal support. However, in *D'hue v. D'hue*, 8th Dist. No. 81017, 2002-Ohio-5857, the Eighth Appellate

---

1. As part of his factual findings, the court magistrate declined to set a "de facto" date for the marriage. Despite this, the magistrate still indicated that he would consider the four-year cohabitation period in setting the amount of the spousal support award.

29

District held that the trial court has the discretion to set a de facto date of the marriage which is prior to the actual date of the ceremony. *Id.* at ¶90. In concluding that the *D'hue* trial court had not abused its discretion in setting a de facto date, the appellate court emphasized that the wife had been financially dependent upon the husband during the pre-marital cohabitation period. *Id.*

{¶90} Given that the nature of the parties' relationship in this action was virtually the same both before and after their actual marriage, the evidence supported the factual finding that the parties' de facto marital relationship began in April 1991. Therefore, since the parties' de facto marriage lasted for approximately seventeen years, six years of spousal support is consistent with the total duration of their relationship.

{¶91} Regarding the monthly amount of the support order, appellant again states that the court magistrate miscalculated the extent of his annual income. In addition to our analysis of appellant's sixth assignment, this court would further note that, as part of his determination of the final support order, the magistrate found that appellant's yearly income would increase by $24,000 once he took possession of the marital residence. This finding was based upon appellant's own testimony that he would be able to rent the "horse" facilities and part of the home. Adding this sum to appellant's average annual income from the insurance company, the magistrate found appellant's total yearly income to be $140,760.

{¶92} Given that the finding of an additional $24,000 in income was based upon appellant's own testimony, he cannot seriously challenge the magistrate's determination to increase his annual income accordingly. Therefore, the question before this court is whether, in light of appellant's annual income of $140,000, a monthly support payment

of $2,500 each month is appropriate and reasonable. In making this decision, both the magistrate and trial court were obligated to consider the factors listed in R.C. 3105.18(C)(1). *See Slobody*, 2008-Ohio-3395, at ¶24-25. These factors include: (1) the parties' respective incomes; (2) their respective earning abilities; (3) the parties' ages and health; (4) their respective retirement benefits; (5) the length of the marriage; (6) whether it is appropriate for a spouse to seek employment outside the home; (7) the marital standard of living; (8) the education level of each party; (9) their respective assets and liabilities; (10) any contribution of one party to the education of the other; (11) the time and expense which one party will need to obtain an education; (12) the tax consequences of the spousal support award; (13) any lost income directly stemming from one party's marital responsibilities; and (14) any other relevant factor.

{¶93} To the extent that the foregoing factors were relevant to the specific facts of this case, the evidence presented at trial supported these findings: (1) appellant's relative earning ability was substantially greater than appellee's present ability; (2) appellee plans to attend college and obtain a nursing degree; (3) prior to the actual marriage, appellee assisted appellant in the maintenance of the "horse" facilities; (4) appellee was primarily responsible for the care of the parties' only child; (5) the full length of the parties' marriage was approximately 17 years; and (6) the parties enjoyed a relatively high standard of living during their marriage.

{¶94} In light of the foregoing six points, the monthly spousal support order of $2,500 was reasonable. As the trial court did not abuse its discretion in adopting the magistrate's recommendation regarding the final spousal support order, appellant's eighth assignment is without merit.

**{¶95}** Under his next assignment, appellant maintains that the trial court erred in distributing the funds that were contained in the parties' "school" account for their minor daughter. In his written decision, the magistrate essentially concluded that control over all of the funds in the account should be given to appellee so that she could distribute it when the daughter went to college. After appellant objected to this conclusion, the trial court rejected the magistrate's recommendation and ordered that the account funds be split between the parties as marital property. While not objecting to the designation of the "school" funds as marital property, appellant claims the funds should not have been split because the parties clearly intended for the funds to be saved and used for their daughter's education.

**{¶96}** In its separate entry concerning the parties' respective objections, the trial court did not provide any reasoning for its decision to grant appellant's objection as to the "school" account. Nevertheless, the parties could not agree on the primary purpose of the account. Appellee asserted that the account was solely for college, while appellant testified that the account was also intended for the daughter's secondary schooling. Appellant also testified that it might be better to split the remaining funds between the parties and have each be responsible for certain expenses.

**{¶97}** Given the discord between the parties, the trial court justifiably concluded that neither party could be trusted to administer the "school" funds for the complete benefit of the child. Under the circumstances, the resolution to split the funds between the parties like any other marital asset, was warranted. As the trial court did not abuse its discretion in resolving the dispute in this manner, appellant's ninth assignment does not have merit.

{¶98} Under his tenth assignment, appellant contends the trial court erred in allowing appellee to take $35,000 from one of the parties' investment accounts while the case remained pending. Immediately before the release of the magistrate's decision in August 2010, appellee moved the trial court for access to the funds, claiming that she needed them in order to enroll the parties' daughter into a new private school. After a telephonic conference was held, the trial court granted the motion in part. Before this court, appellant argues an evidentiary hearing on the motion should have been conducted before a final ruling was made.

{¶99} As to this point, as part of its judgment granting appellee's motion, the trial court expressly stated that the $35,000 would be deducted from appellee's share of the subsequent property distribution. Accordingly, even if the proper procedure was not followed, appellant ultimately was not prejudiced regarding the final distribution of the marital property. The tenth assignment of this appeal lacks merit.

{¶100} Under his eleventh assignment, appellant argues that the magistrate erred in essentially finding he improperly took $20,000 from the "school" account for their daughter, and requiring him to repay the amount as part of the distribution of the marital property. During trial, appellee raised a question as to the disposition of the $20,000, testifying that, even though they were still married at the time the funds were removed, appellant never informed her of the withdrawal. In response, appellant provided an explanation as to what the funds were used for, but gave conflicting statements on the point. In light of this, the magistrate held appellant liable for the amount. Appellant now states that this aspect of the final property distribution should be reversed because it was never shown that he used the $20,000 for an illegitimate purpose.

{¶101} The funds in question were removed from the account in June 2008, approximately six months before the divorce proceeding was filed. It is also undisputed that, although the account was originally created to provide for the daughter's future education expenses, all funds in the account stemmed from the sale of a marital asset. Hence, appellant was clearly entitled to have access to the funds.

{¶102} As of June 2008, the parties were involved in two separate projects. First, they were renovating the kitchen of their marital residence. Second, they were making considerable improvements to the building they recently purchased through their partnership entity. As a result, appellant was issuing a number of checks to pay for various items, and was instructing his brokerage firm to transfer funds between various accounts.

{¶103} When questioned about the $20,000, appellant gave conflicting answers; therefore, it was apparent that, at the very least, he could not expressly remember how he had used the funds. From this, the magistrate did not conclude that appellant had a nefarious purpose in taking the $20,000, but only held that appellant had not provided a credible explanation.

{¶104} As used in regard to the distribution of marital assets in a divorce, the term "financial misconduct" includes "the dissipation, destruction, concealment, or fraudulent disposition of assets, * * *." R.C. 3105.171(E)(3). The burden of proving the necessary facts to satisfy this statutory definition rests with the complaining spouse. *Hvamb*, 2003-Ohio-921, at ¶15.

{¶105} In raising the issue of the $20,000, appellee did not present any evidence as to the ultimate disposition of the funds. Moreover, she failed to submit any evidence

from which it could be inferred that appellant concealed or otherwise fraudulently disposed of the funds. The evidence before the magistrate indicated that the funds were used for the parties' benefit. As such, appellee failed to carry her burden of proving that appellant committed an act of financial misconduct warranting reimbursement of the funds to her benefit. For this reason, appellant's eleventh assignment has merit.

{¶106} Under his final assignment, appellant states that the magistrate committed prejudicial error in setting the amount of his temporary and final child support obligation. As he argued in relation to the spousal support orders, he maintains that the magistrate improperly inflated the extent of his yearly income in light of the decrease in business of his insurance company.

{¶107} A review of the arguments under this assignment shows that appellant has raised the same contentions that formed the basis of his sixth and eighth assignments. Thus, for the reasons stated in our discussion of those assignments, appellant's twelfth assignment is not well-taken.

{¶108} Pursuant to our analysis under appellant's eleventh assignment of error, the trial court's final judgment of May 5, 2011, is hereby modified to the following extent: (1) it is held that appellant did not engage in financial misconduct in disposing of the $20,000 taken from the parties' "school" account for their daughter; and (2) instead of the sum of $130,277,50, appellant shall now only owe appellee the sum of $120,277.50 to equalize the division of marital property. In all other respects, the assignments of error are without merit. Accordingly, it is the judgment and order of this court that the final judgment of the Geauga County Court of Common Pleas is modified and affirmed

35

as modified.

CYNTHIA WESTCOTT RICE, J., concurs,

DIANE V. GRENDELL, J., concurs in part, and dissents in part, with a Dissenting Opinion.

_____

DIANE V. GRENDELL, J., concurs in part, and dissents in part, with a Dissenting Opinion.

{¶109} The Judgment granting a divorce to plaintiff-appellee, Sandra L. Davis, and defendant-appellant, Charles W. Davis, contains several fundamental errors. Accordingly, I dissent and would remand the lower court's Judgment to recalculate Charles' support obligations and to reconsider the division of marital property.

{¶110} The first error was the magistrate's decision to impute $24,000 of income to the defendant, based on "the amount of rental income Defendant can reasonably expect to derive from the Music Street property," without making any finding that the defendant was voluntarily unemployed or underemployed. Specifically, the magistrate found: "that Defendant's income, for purposes of determining his child and support obligations, is $116,760, his average salary from the A.R. Davis Co., plus the additional $24,000 per year that this Magistrate finds is a reasonable, conservative estimate of what Defendant himself says he can generate from the Music Street property, for a total of $140,760 per year."

{¶111} As defined by the Revised Code, "income" means, "[f]or a parent who is employed to full capacity, the gross income of the parent." R.C. 3119.01(C)(5)(a). "For a parent who is unemployed or underemployed, ['income' means] the sum of gross

36

income of the parent and any potential income of the parent." R.C. 3119.01(C)(5)(b). "Potential income" includes imputed income, provided that a court determines the parent "is voluntarily unemployed or voluntarily underemployed." R.C. 3119.01(C)(11)(a).

{¶112} In the present case, neither the magistrate nor the court made such a finding. Thus, it was error to include potential income in the determination of defendant's income. Since the erroneous figure of $140,760 was the basis for calculating the defendant's spousal and child support obligations, those orders must be reversed.[2]

{¶113} A second error is the magistrate's finding that the defendant did not have a separate property interest in the property at 11061 Music Street. The magistrate found that defendant purchased this property in 1988, prior to the parties' cohabitation, for $141,000: a $40,000 cash down payment with the remainder financed. Between 1991 and 1993, the defendant made improvements to the property, "with his separate property," in the amount of $111,067. At the time of the parties' marriage in January 1995, the property was worth $150,000, and increase of $9,000 from the original purchase price.

{¶114} The magistrate concluded, however, that "the real property at 11061 Music Street, Newbury, is marital property." The magistrate explained: "Defendant acquired the property before marriage; but after marriage, the parties jointly refinanced the property several times, to get money for improvements, or to obtain better interest rates. Defendant conveyed his entire interest in the property to Plaintiff for estate

---

2. Given the record before this court, a finding that the defendant is unemployed or underemployed does not have much factual support. Likewise, the calculation of the potential rental income was based on speculative testimony. *See, generally, Rock v. Cabral*, 67 Ohio St.3d 108, 616 N.E.2d 218 (1993).

planning purposes, and she later conveyed back to him a half interest. These conveyances alone extinguished any separate property claim Defendant might have had."

{¶115} On the contrary, "it is well-settled that 'the refinancing of a home after a marriage does not in any way convert separate property into marital property where the mortgage was not taken in order "to finance the purchase of the residence."'" *Smith v. Emery-Smith*, 190 Ohio App.3d 335, 2010-Ohio-5302, 941 N.E.2d 1233 (11th Dist.), ¶ 37, citing *Ockunzzi v. Ockunzzi*, 8th Dist. No. 86785, 2006-Ohio-5741, ¶ 20 (cases cited); *Montgomery v. Montgomery*, 12th Dist. No. CA2003-04-008, 2004-Ohio-3346, ¶ 21-24. This court has also held that transfer of title, without more, is insufficient to demonstrate an inter vivos gift between spouses. *Siefert v. Siefert*, 11th Dist. No. 2011-T-0103, 2012-Ohio-3037, ¶ 15 ("[t]his is particularly true where the transfer of the asset has a potential alternate purpose, such as estate planning").

{¶116} Since the refinancing of 11061 Music Street does not destroy the defendant's separate, premarital interest in the property, and the title transfer does not demonstrate a donative intent, the magistrate's conclusion that defendant has no separate interest in the property is without any legal foundation. The order regarding 11061 Music Street must be reversed.

{¶117} Finally, the magistrate's conclusion that the 445 shares of stock in the A.R. Davis Company are marital property is against the weight of the evidence. At trial, the defendant testified that he received these shares, upon his father's death in 2006, "in his will." In support, defendant introduced a portion of the company's share ledger, recording the transfer of 445 shares in his name from the Albert R. Davis Living Trust,

on October 25, 2006. At no time prior to, or during, trial did the plaintiff dispute defendant's testimony or otherwise claim an interest in the ownership of this stock.

{¶118} With respect to these shares, the magistrate found as follows:

As to the remaining 445 shares that he received on his father's death, he got those shares either under his father's will, as he testified, or as a distribution under his father's living trust agreement. If he received them as an inheritance under the will, he had the burden of establishing that fact. His testimony is the only evidence that he got those 445 shares as an 'inheritance … by bequest, devise, or descent.' Defendant could have offered a copy of his father's will, and of probate court orders directing the distribution of the shares; these documents could have established how he received them. Defendant did not offer that evidence and did not explain why he did not or could not. If he received the 445 shares as a distribution under his father's living trust, a similar observation applies: he could have obtained a copy of the trust showing that he was its only beneficiary as to those shares; and that evidence might have established that his father gifted those shares only to Defendant, and not to the parties jointly. Defendant did not offer any such documents or explain why he did not or could not offer them.

On these grounds, the magistrate concluded that defendant failed to meet his burden with respect to the 445 shares.

{¶119} The defendant's trial testimony and the share ledger are competent to prove that he inherited the 445 shares. The lower court erroneously dismissed the

evidence of the share ledger as being "neither probative nor reliable to meet that burden." In fact, a share ledger is "prima facie evidence of the distribution of shares in the corporation in absence of certificates." *Lancione v. Presutti*, 7th Dist. No. 01-BA-26, 2002-Ohio-7440, ¶ 46; R.C. 1701.37(B) ("[s]uch list [of the shareholders of record] or lists when certified by the officer or agent in charge of the transfers of shares shall be prima-facie evidence of the facts shown therein"). Accordingly, the defendant's oral and documentary evidence were sufficient to meet his burden of proof.

{¶120} The magistrate faulted the defendant for not introducing evidence of the will or trust. Given the fact that defendant introduced competent and credible evidence of the inheritance, it would be more appropriate to question why the plaintiff did not introduce such documents, as the party bearing the burden of rebutting defendant's testimony. Accordingly, the defendant is entitled to the 445 shares of A.R. Davis Company stock as his separate property.

{¶121} For the foregoing reasons, I respectfully dissent. In all other respects, I concur in the judgment of this court.